RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0440p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GAILE K. OWENS,

        *Petitioner-Appellant,*

    *v.*

No. 05-6105

EARLINE GUIDA, Warden,

        *Respondent-Appellee.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 00-02765—J. Daniel Breen, District Judge.

Argued: January 29, 2008

Decided and Filed: December 9, 2008

Before: BOGGS, Chief Judge; and MERRITT and SILER, Circuit Judges.

---

## COUNSEL

**ARGUED:** Gretchen L. Swift, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Gordon W. Smith, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Gretchen L. Swift, Christopher M. Minton, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Gordon W. Smith, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

    BOGGS, C. J., delivered the opinion of the court, in which SILER, J., joined. MERRITT, J. (pp. 21-27), delivered a separate dissenting opinion.

---

## OPINION

---

    BOGGS, Chief Judge. Gaile K. Owens ("Owens") is on Tennessee's death row because she hired Sidney Porterfield to kill her husband and Porterfield successfully carried out his assignment. Owens appeals the district court's dismissal of her petition for a writ of habeas corpus. She argues that: 1) she received ineffective assistance of counsel ("IAC") when trial counsel failed to adequately investigate her background and failed to overcome the state's hearsay objection to one of her penalty-phase witnesses; 2) the state violated *Brady v. Maryland* by failing to turn over letters between her deceased husband and his paramour; and 3) the trial court unconstitutionally prevented her from offering, as mitigating evidence, testimony that she wanted to plead guilty in return for receiving a life sentence.

1

We reject the first argument and hold that the Tennessee courts reasonably applied *Strickland v. Washington* by concluding that Owens sabotaged her own defense and that counsel's performance is not deficient when counsel follows a client's instructions. Likewise, we reject her second argument and hold that the Tennessee courts reasonably applied *Brady* because even if the letters were favorable evidence, and were suppressed by the state, Owens was not prejudiced because she could have presented other evidence of the affair but chose not to do so. Finally, we reject her third argument and hold that the Tennessee courts reasonably applied *Lockett v. Ohio* in refusing to admit Owens's evidence because no court, let alone the Supreme Court, has held that failed plea negotiations may be admitted at a penalty-phase hearing. Therefore, we affirm.

I

In early 1985, Owens solicited several men to kill her husband, Ronald Owens. Evidence at her trial, as detailed in *State v. Porterfield*, 746 S.W. 2d 441 (Tenn. 1988), showed that she met with one of the would-be hitmen, Sidney Porterfield, at least three times. Ronald Owens was found in the family's den on February 17, 1985, with his skull smashed from at least 21 blows from a tire iron. He had been beaten with so much force that fragments of his skull had been driven into his brain and his face had been driven into the floor. Blood was splattered over the walls and floor. A pathologist's report showed extensive injuries to his hands, indicating that he had been trying to cover his head with his hands during the savage attack.

After Ronald Owens's corpse was discovered, George James, one of the other men solicited by Owens, feared that he might be a murder suspect and went to the police. James agreed to wear a wire and meet with Owens. At the meeting, Owens explained that she had her husband killed because of "bad marital problems" and paid James $60 to keep quiet. Police listened from a nearby car and arrested Owens immediately and Porterfield soon afterwards. Owens ultimately confessed to hiring, and Porterfield to committing, the murder. Porterfield stated that Owens offered him $17,000 to murder her husband, and also that he went to Owens's house about 9:00 pm on the night of the murder, ambushed Ronald Owens in the backyard, and then fought with him until they ended up inside where Porterfield beat Ronald Owens to death. Gaile Owens explained to the police that she had Ronald killed because "we've just had a bad marriage over the years, and I just felt like he had been cruel to me. There was very little physical violence."

Prior to trial, the prosecution offered both defendants a life sentence in return for a guilty plea, contingent on both of them accepting the plea. Owens accepted, but Porterfield refused, so the offer was withdrawn and the pair were tried jointly for first-degree murder. Neither defendant testified at trial. At trial, Owens's counsel's theory was that Owens had withdrawn her murder solicitation and that Porterfield murdered Ronald in a botched burglary. The prosecution introduced both Porterfield's and Owens's confessions, as well as testimony that Porterfield and Owens were seen talking together the day of the murder. Porterfield introduced no evidence in his defense, while Owens introduced testimony from a neighbor who said that Owens was hysterical after her husband's body was found. The jury convicted both Owens and Porterfield of first-degree murder.

During the penalty phase, Owens offered testimony from Dr. Max West, a psychiatrist who said that he had treated her in 1978 for severe behavior problems and from two jail employees who said that she was a model prisoner. The jury found Owens guilty of two aggravating circumstances, murder-for-hire and a murder that was "especially heinous, atrocious, or cruel." It also found Porterfield guilty of three aggravating circumstances, and sentenced both parties to death. The

defendants took a joint but unsuccessful appeal to the Tennessee Supreme Court. After that, both parties continued to appeal, but through different avenues.[1]

Owens then unsuccessfully sought state post-conviction relief. In 2000, she filed a federal habeas petition in the Western District of Tennessee, raising 26 claims. The petition addressed only her death sentence; it explicitly admitted that she hired Porterfield to murder her husband. The district court denied the petition in a 118-page opinion issued on June 15, 2005, and later denied Owens's motion to amend the judgment. The court then granted Owens a limited certificate of appealability (COA). From Claim 1, penalty-phase IAC, the district court certified Subclaim 1(a), for failure to investigate mitigating evidence, and Subclaim 1(c), for failure to overcome the state's hearsay objections. The district court also certified Claim 2, for a *Brady* violation. This court expanded the COA to include a third claim, that the trial court unconstitutionally prevented Owens from presenting evidence that she had accepted the prosecution's plea offer.

II

We review the district court's decision de novo. *Slagel v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006). Owens filed her federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). AEDPA's familiar standards therefore apply. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997).

Under AEDPA, a state court's factual findings are presumed correct and must be accepted unless the petitioner rebuts them with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *McAdoo v. Elo*, 365 F.3d 487, 493–94 (6th Cir. 2004). Our review of the state court's legal conclusions is also deferential. AEDPA permits us to grant a state prisoner's habeas petition only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . [was] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state-court decision is contrary to clearly established federal law "if the state court arrives at a conclusion that is opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *(Terry) Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state-court decision unreasonably applies federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Ibid*. As Justice O'Connor explained in *Williams*, the term "unreasonable application" may be difficult to define, *id.* at 410, but the standard is deferential because

> Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 411. Elsewhere, the Supreme Court has held that "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination

---

[1] Porterfield, unlike Owens, unsuccessfully sought certiorari from the United States Supreme Court. *Porterfield v. Tennessee*, 486 U.S. 1017 (1988) (denying certiorari). He currently has an appeal pending before a different panel of this court. *See Porterfield v. Bell*, Case No. 01-5107. The case has been stayed while Porterfield exhausts his *Atkins* claim in state court.

was unreasonable — a substantially higher threshold." *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939 (2007). "[C]learly established federal law" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. "AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Schriro*, 127 S. Ct. at 1939–40. Ultimately, AEDPA's highly deferential standard requires that this court give the state-court decision "the benefit of the doubt." *Slagle*, 457 F.3d at 514 (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).

### III

Owens's habeas petition divided her IAC claim into three parts. She argued in Subclaim 1(a) that trial counsel was ineffective in failing to investigate her background properly, and in Subclaim 1(c) that counsel was ineffective in failing to overcome the state's hearsay objection to the testimony of Dr. West, one of her proffered mitigation witnesses. Both subclaims are before us on appeal. Owens also seeks to argue Subclaim 1(b) from her habeas petition, that counsel should have obtained an independent mental health evaluation. (Petr.'s Br. 55–57). This issue has not been certified for appeal and will not be considered.

### A

The relevant "clearly established federal law" is *Strickland v. Washington*, 466 U.S. 668 (1984). To show IAC, Owens "must show that counsel's performance was deficient," and that "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "[D]eficient performance" means that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. To establish prejudice, Owens must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In the context of a death sentence, the question of prejudice turns on "whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

*Strickland* emphasized that

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Id.* at 689 (internal citation deleted). Justice O'Connor's discussion in *Strickland* recognized another fact that is particularly relevant to this case. She explained that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," and "[i]n particular, what investigation decisions are reasonable depends critically" on what the defendant does. *Id.* at 691.

Our court has previously vacated death sentences when the defendant's counsel failed to investigate adequately the defendant's background for mitigating evidence. *See generally Poindexter v. Mitchell*, 454 F.3d 564, 577–78 (6th Cir. 2006) (collecting cases). Failure to perform *any* investigation into the background of the defendant when that investigation would have revealed

extensive mitigating evidence is constitutionally deficient. *Wiggins v. Smith*, 539 U.S. 510, 523–28 (2003). However, contrary to Owens's assertion, a limited investigation is not per se ineffective. A limited investigation is reasonable if counsel could reasonably have concluded that additional investigation would be of little use. *Wiggins*, 539 U.S. at 525. Furthermore, "[n]either *Wiggins* nor *Strickland* addresses a situation in which a client interferes with counsel's efforts to present mitigating evidence to a sentencing court." *Schriro*, 127 S. Ct. at 1942.

*Schriro* addressed the situation where a client thwarted his attorneys' efforts to present mitigating evidence, and it held that the defendant's "established recalcitrance" and persistent "undermining" of counsel's efforts defeated his ineffective assistance claim. *Id.* at 1941–42. *Schriro* mirrors cases from our own circuit that have held that a client who interferes with her attorney's attempts to present mitigating evidence cannot then claim prejudice based on the attorney's failure to present that evidence. *See, e.g.*, *Lorraine v. Coyle*, 291 F.3d 416, 435 (6th Cir. 2002); *Coleman v. Mitchell*, 244 F.3d 533, 545 (6th Cir. 2001) ("An attorney's conduct is not deficient simply for following his client's instructions.").

B

Before turning to the specifics of Owens's claim, we pause to make three points about the unusual state of the evidence in this case. Owens focuses on mitigating evidence that exists now, but this is looking through the wrong end of the telescope. The question is not what evidence she would use if her mitigation hearing took place today, but what evidence was available to her trial counsel when her trial took place. The record shows that much of the evidence Owens now presents could not have been presented to the state court no matter what her trial counsel would have done.

1.      Owens Hamstrung Her Own Attorneys

Owens foreclosed her attorneys from pursuing the best sources of mitigating evidence. First, contrary to counsel's advice, she refused to testify at either the guilt phase or the penalty phase of her trial. *See* J.A. 156–57, 387. Her counsel explained that he "tried," "wanted" and even "had to" get her to testify given the strength of the evidence against her in order to win the jury's sympathy. *Id.* at 387, 401–03. Nevertheless, she refused. Therefore, any evidence that Owens had could not have been presented directly to the jury and her attorneys could not have pursued any defense that relied on Owens's personal testimony or her demeanor before the jury.

Second, Owens refused to cooperate when her attorneys moved for an independent mental health examination because they believed that they might be able to raise a battered-wife-syndrome defense. J.A. 202–03 (state post-conviction ruling). The state court ordered Owens to be evaluated by state physicians and stated that if the examination showed cause, it would then order funds and an independent evaluation. *Ibid.* Experts from the Midtown Mental Health Center examined Owens *three times*. Each time Owens answered a few preliminary questions and then refused to speak further. During the post-conviction hearing, one of her attorneys testified that "I'm sure that I told her to cooperate" because "we needed the mental evaluation." J.A. 373. Her non-cooperation[2] deprived counsel of any evidence, or leads to evidence, that a complete mental evaluation could have produced. *Cf. Lorraine*, 291 F.3d at 435 (counsel who arranged for psychological tests not ineffective when capital defendant refused to cooperate with doctors).

---

[2] Owens implies that trial counsel were too incompetent to obtain an independent mental health examiner (even though this issue is not officially certified for appeal),because they somehow failed to follow the proper procedures and she further implies that but for this incompetence, an independent examination would have taken place. The record shows that the blame falls on Owens's own shoulders. Trial counsel asked for funds. J.A. 201–03. The trial judge agreed to grant them if a state examination showed enough evidence to warrant further investigation. *Ibid.* Trial counsel then arranged three separate examinations, but Owens did not cooperate. *Ibid.*

Third, Owens refused to let her attorneys interview her family members or call them to testify on her behalf. The state post-conviction court found this to be a fact. J.A. 214. Therefore, we must accept this fact unless Owens can refute it with "clear and convincing evidence." *Schriro*, 127 S. Ct. at 1939–40. She cannot. Owens's sister Carolyn Hensley testified at the state post-conviction hearing that Owens told her that Owens had ordered her counsel "not to involve [the family] in any way" with the trial. J.A. 623. Hensley added that neither she nor the other members of the family would have wanted to testify even if they had been asked.[3] *Id.* at 625, 627–28. By contrast, her trial counsel testified only that she "might" have wanted him to speak with "her grandfather or mother or father." *Id.* at 395–96. It was reasonable for the state court to accept the clear testimony of Owens's sister on this matter and find that Owens refused to allow the involvement of her family. Therefore, any information known to the family members, and any information that would have been gathered based on leads provided by Owens's family members, could not have been presented at trial regardless of what Owens's trial counsel did.

Owens, of course, was constitutionally entitled to impose these limits on her attorneys. But she cannot then claim that her attorneys were "ineffective" for taking her advice. In order to prove that she was *prejudiced* by her *trial counsel's* failure to investigate her background, she must show not just that trial counsel could have discovered mitigating information, but that the information could have been discovered and credibly presented without: 1) Owens testifying at trial; 2); Owens undergoing additional mental health testing; 3) or counsel interviewing Owens's family.

2.      Owens's Trial Counsel's Timesheets Are Not Controlling

James Marty and Bret Stein[4] represented Owens at trial. Marty had served as counsel in four prior capital cases and was appointed seven months before trial. Their time sheets say that they spent only two hours on "pretrial investigation." Although Owens's certified IAC claim is based on the facts counsel failed to investigate, rather than the time they spent investigating, she uses these time sheets to create a perception that counsel were ineffective do-nothings. But this impression is neither legally controlling or factually accurate.

As to the law, the amount of time trial counsel spent preparing for trial is neither before us nor dispositive. *See, e.g.*, *Hopkinson v. Shillinger*, 866 F.2d 1185, 1217 (10th Cir. 1989) (defendant must show specific errors, and cannot prevail because of limited time attorney spent on case) (citing *United States v. Cronic*, 466 U.S. 648, 666 (1984)), *overruled on other grounds by Sawyer v. Smith*, 497 U.S. 227 (1990). As to the facts, Marty testified at the state post-conviction hearing that "the time sheets were always 'way short of the time' he actually spent working on the cases" and that he had interviewed several witnesses but could not remember the content of their testimony. Marty's fuzzy memory is understandable given that more than ten years passed between the trial and the post-conviction hearing. Nevertheless, his testimony on this point is credible, given that he located Dr. West, a psychiatrist whom Owens had seen once seven years earlier, scheduled three unsuccessful interviews between Owens and the State's mental health professionals, and that Owens's restraints on his investigation left him with little on which to spend his time. Entries in his timesheets for multiple interviews with Owens and for filing motions with the court confirm that he did not neglect his pretrial responsibilities. Stein testified that his case file had been burned in an office fire and thus he could not remember or prove what he had done. Put simply, it is almost

---

[3] Indeed, when Hensley testified at the post-conviction hearing, Hensley complained about the "pressing and pressing" and the "whole guilt maneuvering thing" that Owens's post-conviction attorneys used when they called Hensley and other family members and asked them to testify on Owens's behalf.

[4] Originally, Wayne Emmons was Marty's co-counsel, but a month before the trial, Emmons withdrew and was replaced by Stein.

certain that Owens's trial counsel spent more than two hours on pretrial investigation, and even if they did, this fact alone does not entitle Owens to relief no matter how often she repeats it.

> 3.        Much of Owens's Evidence is Irrelevant To This Appeal

The district court reviewed Owens's claims "only to the extent and form in which they were presented to the state courts." As the state points out, this was correct because considering new facts for the first time in federal court would render AEDPA meaningless because a state court could not apply federal law to facts it never saw. Owens includes evidence outside the state-court record in her appeal, but this evidence should, and will, be ignored.

Furthermore, Owens's method of presenting her evidence complicates how we view the record. At her post-conviction hearing, she did not present evidence of mitigation, and then call an independent mental health professional to explain the evidence's meaning. Instead, she introduced most of her mitigating evidence though her mental health expert, "traumatologist" Eric Gentry, whose services were paid for by the state during the post-conviction proceedings. Therefore, much of Owens's evidence is part of the record only because Gentry summarized the information in his testimony.

Yet when Owens presented her petition to the district court, her IAC claim included Subclaim 1(b), that counsel were ineffective for not obtaining an independent mental health expert. This claim was rejected and it has not been certified for appeal, so it should not be considered. *Hill v. Mitchell*, 400 F.3d 308, 335 (6th Cir. 2005). This ruling impacts the way we view Owens's evidence that is only part of the record because Gentry recounted it second-hand. It is logically inconsistent to say that we may not consider trial counsel's ineffectiveness in not obtaining funds for a mental health expert, but we may look at the evidence such an expert could have presented, if only counsel have been effective enough to get the money to hire him. It is also logically inconsistent, when asking what trial counsel should have done, to rely on evidence from an interview with a mental health counselor given in preparation for the post-conviction hearing when Owens was interviewed three times by mental health professionals before her trial but refused to cooperate despite being advised to do so by her attorneys. Owens must affirmatively prove that she was prejudiced. So, when arguing that certain evidence should have been presented, Owens must show that it *could have been presented without the aid of a state-funded mental health expert*. She cannot do this by pointing to evidence that is only part of the record because it was introduced through a state-funded mental health expert.

Furthermore, even if we consider the evidence presented through Gentry, the state court and the district court correctly determined that Gentry is not credible. His qualifications are dubious, his sources suspicious, and his testimony subject to contradiction. Gentry had a "Masters in Counseling" degree (the record is not clear from where), but he is not a medical doctor, and at the time he testified, he had no license in any discipline and had not published. His claimed "certifications" included "Art Therapy," "Biofeedback," and "Eye Movement Desensitization." His "experience" consisted of one year at an adolescent shelter, one year as a sex abuse counselor, one year working with homeless children, one year as a counselor in a "wilderness school," a year and a half at a community agency, and four years working for another psychiatrist as a therapist. He had no training in forensic psychology and he had never testified as an expert before.

Gentry offered a "psychosocial" history of Owens's life. He concluded that because Owens grew up in a poor home where she suffered physical and emotional abuse and later suffered additional physical, sexual, and emotional abuse at the hands of Ronald Owens, she "developed very poor problem-solving and conflict resolution skills" and thus warranted leniency. Almost all of this report was hearsay, some of it "double and triple hearsay from anonymous persons." Gentry produced no medical evidence and performed no clinical tests. He also relied extensively on reports

from members of Owens's family (whom Owens refused to let her counsel contact) and on statements from Owens herself (who refused to testify at trial, and certainly has a motive to be less than truthful). One of his major sources was Owens's brother Wilson, yet Gentry admitted on cross-examination that he did not know that Wilson, who lived in an adult care facility, suffered from mental retardation. Owens's sister Carolyn Hensley testified that when she spoke with her brother Wilson about Gentry's interview, Wilson was "very confused and had been manipulated by somebody." Given Gentry's extensive reliance on Wilson's testimony, Hensley's observation did not help Gentry's credibility. Nor did the fact that Gentry testified on direct examination that he had verified one incident of abuse with Owens's family members but later admitted on cross-examination that he had not. Even if one accepts his unverified allegations of trauma, to the extent that those allegations rest on hearsay from Owens or her family, *they are irrelevant to Owens's IAC claim because Owens's counsel wanted to present the substance of such evidence directly at trial through the testimony of Owens and her family, but Owens refused to cooperate.*

Finally, any evidence that Gentry would have presented at trial easily could have been contradicted and would have opened the door to evidence unfavorable to Owens. Gentry claimed that Owens's husband had once raped Owens with a wine bottle and broken the neck off inside Owens's vagina, yet there is no other evidence that such an assault occurred. Gentry quoted Owens's brother Wilson as saying that life growing up was a "living hell," but this testimony could be contradicted by presenting Hensley's testimony about Wilson's mental limitations and evidence that he had been "manipulated." Gentry claimed that Owens told him that she hired the hitman in a single moment of depression; trial testimony indicated that she had solicited multiple hitmen over a period of weeks. Gentry claimed that Owens was sexually abused by her uncle and reported the incident to her mother but later admitted that Owens's mother said that no sexual abuse occurred. Owens's sister stated that while their father was "too aggressive with discipline[]," the severe abuses that she reported to Gentry never happened. Hensley further testified that she did not trust what Owens said because "over a period of years" Owens would "just lie about stuff." Nothing in Gentry's testimony, even if we consider it, supports finding that Owens's counsel's performance was ineffective.

C

One of the few avenues Owens's counsel could have used to present mitigating evidence was the government's mental health experts at Midtown. Owens answered certain questions before refusing to cooperate further, and the experts could have testified to the answers she gave if trial counsel had issued a subpoena. Although the information was hearsay, it would have been admissible under Tennessee law in the penalty phase of her trial. Notes from the first meeting report that "[i]n relating the events that led up to the alleged crime, she described an unhappy marital situation in which her husband abused her verbally, had affairs, and humiliated her sexually." Another set of (handwritten and hard to read) notes related the following information:

> 1st Marr[iage] for both. 13+ years. Never sure that Ron loved me. He was not one to express feelings. Caught up in the job & []. 2 little boys. He was a good daddy. Didn't spent time with them but loved them. [I] [n]eeded to feel loved—[w]ouldn't be married unless love. [Ron was?] only affect[tionate?] in bed. He didn't think affect[tion] import[ant] but it was to me.

> Last 4–5 yrs. affairs. Didn't [illegible] he didn't deny. None of my business. I run house. It built up in me. I felt like explode. Ask for Div[orce]. He told me I never get kids. Beg him for compliments. Couldn't cope[,] gained weight. Ask[ed] for him to tell me I look nice. He say you don't sweat much for a fat person. Begged him to tell me what I do wrong and I change. Waited on him. [Told?] . . . No ackn[owledment?].

Couln't cope anymore.  1 yr. ago [?] 8 months.  Accused of paying men to kill him.
The one in custody.

(handwritten notes).  Counsel could have presented this evidence to the jury and could have called the staff to testify about Owens's demeanor during this preliminary interview.  The key is that counsel could have called these Midtown counselors because they were one of the few witnesses that Owens did not forbid her attorneys from contacting.

Furthermore, when preparing for the state post-conviction hearing, a staff attorney from the Capital Case Resource Center of Tennessee interviewed Owens, and the interview notes were introduced at the post-conviction hearing.  According to the notes, Owens claimed that: 1) her alcoholic father abused both Owens and her mother; 2) her uncle once fondled Owens; 3) her husband had affairs; 4) her husband abused her physically and sexually; 5) she felt confused by the conflict between how she saw her situation and how others saw it.  There is no evidence that Owens would have cooperated if a similar person would have interviewed her before trial.  If she would have cooperated, perhaps her attorney could have called this hypothetical person from the Capital Case Resource Center and thereby presented this information at the penalty phase.  But given her refusal to testify or to cooperate during her trial, it is at best barely plausible that her attorney could have presented this evidence.[5]

Even if Owens would have cooperated, this hypothetical witness's testimony would suffer several obvious flaws.  None of it is firsthand knowledge; it is hearsay from statements that Owens made *after* the murder and thus it lacks credibility.  The jury would have seen that Owens was trying to tell her story without swearing to tell the truth or facing cross-examination.  Furthermore, this evidence would have permitted the state to bring in Owens's statement to the police that "there was very little physical violence" in their marriage.  Likewise, the state could have responded by calling Carolyn Hensley and having her testify, as she did at the post-conviction hearing, that Owens was lying about the extent of her abuse and generally "lied about stuff."  The state could also have asked the witnesses if they knew of Owens's prior convictions for embezzlement and forgery.  This potential impeachment shows why an effective attorney would hesitate to present this "mitigating" evidence and why Owens was not prejudiced by its absence.

Two other minor pieces of evidence exist. Hospital records show that after the birth of one of her children, Owens suffered vaginal bleeding secondary to a fifteen percent partial abruptio placenta.  This is at least consistent with her allegation, made secondhand through Gentry's report, that her husband sexually abused her the night before.  But it does not prove her claim because the injury could have happened many other ways.  No medical testimony established even speculative causation.  Finally, Owens claims that her trial counsel could have learned of evidence that her husband lied about being wounded in Vietnam and about his educational history.  Trial counsel Marty acknowledged that he "did not request any school, employment, or military records of the victim because he believed they were irrelevant to the case."  But even if we made the dubious assumption that this "general bad character" evidence is admissible, its connection to her husband's abusive conduct is too remote (especially when she refused to testify to that abuse) to say the state court's holding was objectively unreasonable.

D

With that background, we turn to the merits of Owens's IAC claim.

---

[5]Notably, Owens's brief utterly fails to explain her repeated non-cooperation with her trial counsel throughout her entire trial.

1.        Counsel Was Not Ineffective For Failing to Investigate Owens's Background

As mentioned earlier, a limited investigation into a defendant's background is reasonable if defense counsel could reasonably have concluded that further investigation would be of little use. *Wiggins*, 539 U.S. at 525.  Furthermore, *Strickland*, the foundational IAC case, emphasized that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland*, 466 U.S. at 691.

Counsel's decisions here were reasonable, so counsel's performance was not deficient. Counsel could have reasoned that additional investigation would be of little use because Owens's own actions shut off the avenues for mitigation.  Owens would not take the stand herself, would not cooperate with mental health examiners, and would not allow counsel to communicate with her family.  Her actions mirror the conduct of the defendant in *Coleman*, who "did not cooperate with counsel regarding the investigation and identification of mitigating evidence; imposed restrictions upon counsel; and refused to submit to further psychological or psychiatric testing." *Coleman*, 244 F.3d at 545.  There, we held that any failure to present mitigating evidence was the result of Coleman's actions, not deficient performance by his counsel, and denied the claim, holding that "[a]n attorney's conduct is not deficient simply for following his client's instructions." *Ibid.*  The Supreme Court reached a similar decision in *Schriro*, holding that the client's own "established recalcitrance" and persistent "undermining" counsel's efforts defeated her IAC claim. *Schriro*, 127 S. Ct. at 1941–42.

A defendant cannot be permitted to manufacture a winning IAC claim by sabotaging her own defense, or else every defendant clever enough to thwart her own attorneys would be able to overturn her sentence on appeal.  Owens made the same decision as the *Coleman* and *Schriro* defendants and must suffer the same consequences.  Other cases from our own circuit confirm that a client who interferes with her attorney's attempts to present mitigating evidence cannot then claim prejudice based on the attorney's failure to present that evidence. *See Fauntenberry v. Mitchell*, 515 F.3d 614, 624 (6th Cir. 2008) (counsel is not ineffective for failing to persuade client to cooperate); *Lorraine*, 291 F.3d at 435 ("Trial counsel cannot be faulted for their client's lack of cooperation."); *Coleman*, 244 F.3d at 545 ("An attorney's conduct is not deficient simply for following his client's instructions.").  Other circuits have reached similar conclusions. *See Gardner v. Ozmint*, 511 F.3d 420, 427 (4th Cir. 2007) (relying on client's non-cooperation when rejecting ineffective assistance claim based on attorney's failure to investigate mitigation evidence); *Taylor v. Horn*, 504 F.3d 416, 454–56 (3d Cir. 2007) (relying on client's refusal to allow attorney to call witnesses in rejecting ineffective assistance claim); *Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir. 2004) (holding that "when a defendant blocks his attorney's efforts to defend him, including forbidding his attorney from interviewing his family members for purposes of soliciting their testimony as mitigating evidence during the punishment phase of the trial, he cannot later claim ineffective assistance of counsel."); *Bryan v. Mullin*, 335 F.3d 1207, 1223–24 (10th Cir. 2003) (en banc) (counsel not ineffective for failing to present mental health evidence when client told counsel not to present any mental health evidence).

*Rompilla v. Beard*, 545 U.S. 374 (2005), does not change this result. *Rompilla* held that even when the defendant and the defendant's family tell counsel that no mitigating evidence exists, counsel must nevertheless make a reasonable investigation of evidence that counsel expects the prosecution to rely on at trial. *Id.* at 377.  That is not the situation here.  The state did not plan on using against Owens any of  the evidence that Owens's counsel allegedly should have discovered. *Cf. Keith v. Mitchell*, 455 F.3d 662, 671 (6th Cir. 2006) (observing that *Rompilla* held only that "counsel must investigate evidence it knows the state will use against defendant").  Counsel did not conclude, based

on Owens's statements, that no mitigating evidence existed. Rather, counsel realized, based on Owens's conduct and instructions, that there was no credible way to present this evidence to the jury.

Even if we assumed that counsel's performance was deficient, Owens suffered no prejudice. *Schriro* held that obedience to a client's instructions "*could not* have been prejudicial under *Strickland*." *Schriro*, 127 S. Ct. at 1941 (emphasis added). Therefore, the absence of any evidence that required testimony from Owens or information from her family could not have been prejudicial. The limited evidence that counsel could have presented without testimony from Owens or her family—the report from the mental health experts at Midtown, the medical report of her injury the day before her pregnancy, her husband's military records, and (perhaps, assuming she would have cooperated) the information gleaned from someone like the attorney from the Capital Resource Center—is not evidence that was reasonably likely to lead to a different results. Prior cases have refused to find the absence of similar background evidence prejudicial. *See Nields v. Bradshaw*, 482 F.3d 442, 454 (6th Cir. 2007) (evidence that the defendant had a "chaotic and neglected" childhood, suffered from alcoholism, and had a good work ethic); *Keith*, 455 F.3d at 670 (evidence that the defendant's "mother was a drug addict, that he was mostly raised by his grandparents, that his grandmother was a convicted murderer, and that his father was 'known to gamble and run the streets.'"). Even if this evidence would have been introduced, it would have had little credibility (especially since the jury would have seen that it was being presented secondhand through hearsay), would have been subject to contradiction, and would have opened the door for impeachment evidence. What little credibility it had would not overcome the overwhelming case against Owens and the premeditated and brutal nature of the crime. *Cf. ibid.* (holding that given strong evidence of guilt and premeditation, any omitted evidence "does not demonstrate that Keith's life had been so terrible that he was materially less culpable.").

Furthermore, Owens's entire IAC claim boils down to a claim that her counsel should have presented a "battered-wife syndrome" defense. Yet her trial counsel looked into both a battered wife syndrome defense and an insanity defense—indeed, Mr. Emmons mentioned both defenses by name to the trial judge. It is in cases like this one, where the current record offers the defendant a plausible defense that trial counsel never made, that the "distorting effects of hindsight" and the temptation to "second-guess counsel's assistance after a conviction" that *Strickland* warned against exert their strongest influence. *Strickland*, 466 U.S. at 689. But it is cases like this where we must be careful to follow *Strickland*'s advice and focus on counsel's perspective at the time. *See ibid.* It is not trial counsel's fault that Owens refused to cooperate and give them the evidence or permission to contact family members that they needed to make such a defense. Under the "highly deferential" review of *Strickland*, *ibid.*, and the additional deference of AEDPA, we conclude that counsel did the best they could with a recalcitrant client.

2.     Counsel Was Not Ineffective For Failing to Obtain Funds for an Independent Mental Health Expert.

As previously explained, this claim has not been certified for appeal and will be given no further discussion.

3.     Counsel was Not Ineffective for Failing to Overcome the State's Hearsay Objection to the Testimony of Dr. West

During the sentencing phase, trial counsel called Dr. Max West, a psychiatrist who had seen Owens for a single one-hour session in 1978. Owens's counsel asked West what Owens told West about her family history. The state objected on grounds of hearsay, and the defense withdrew the question. Later, defense counsel asked the same question in a different way, and once again the state objected. Ultimately, West testified only that Owens had "some kind of severe problem."

Tenn. Code Ann. § 39-2-203(c) (1982) would have permitted West to answer the question because it allows testimony about a defendant's background at a capital sentencing proceeding "regardless of its admissibility under the rules of evidence." Counsel never cited this statute. The state court ruled that this decision was a legitimate strategic decision that was neither defective nor prejudicial to Owens. The district court interpreted the state court as having made a "factual" determination, and found that this determination was not objectively unreasonable. Although the district court incorrectly called the question of prejudice a "factual" question rather than a "mixed question of law and fact," *see Strickland*, 466 U.S. at 698, its ultimate conclusion was correct.

Owens argues that if West had testified further, he would have said that Owens told him that: 1) her parents were too hard on her; 2) she was forced to care for a mentally retarded brother; 3) her parents habitually lied to each other and to the children; 4) she never felt like she was needed; and 5) she had a "fairly severe characterological [sic] or personality disorder."

Although trial counsel's failure to overcome the hearsay objection looks deficient at first glance, it may not have been deficient because Marty testified at the post-conviction hearing that he had good reasons for not wanting further testimony from West. Marty said that he "was fearful of what [West] was going to testify to." The statements Marty "feared" included a statement by West that Owens was "a pathological liar and possibly could commit homicide." However, at the post-conviction hearing, West denied commenting about Owens's "homicidal tendencies" or describing her as a "pathological liar," but acknowledged that he knew that she had "a serious problem telling the truth."

Even if we disbelieved Marty's testimony about what West told Marty and concluded that counsel's failure to overcome the hearsay objection was defective, the state courts reasonably concluded that it was not prejudicial. West's testimony would have related a harsh childhood, but it would not have established the kind of extreme physical and sexual abuse that Owens later claimed to have experienced. Nor would it have established the kind of childhood that could have made Owens less culpable in the eyes of the jury. *Cf. Keith*, 455 F.3d at 670. As with the hypothetical testimony from Gentry or the Midtown mental health counselors, the jury would have realized that West's testimony was merely relating secondhand information that Owens provided years before the murder.

Marty also recognized that if he pressed West further, the prosecution would have asked West on cross *why* Owens went to see him, and West would have been forced to respond that she had done so after being charged with embezzling money. Likewise, West testified at the post-conviction hearing that when he saw Owens, she reported that "everything was fine with her husband." The prosecution could have brought this information up on cross-examination if West had spoken more at trial, and it could have forced West to acknowledge Owens's tendency to lie. Given this looming impeachment evidence, Owens was not prejudiced by West's silence.[6] Instead, West was able to state Owens had a "severe problem" without explaining what that problem was, thus allowing the jury to make a favorable inference.

IV

Owens claims that the state violated *Brady* by failing to turn over: 1) sexually suggestive cards and love notes between Ronald and Gala Scott; and 2) a police report that discussed these notes and summarized an interview with Scott in which she admitted to the affair. The state court denied these claims on grounds that: 1) these notes were not favorable, and therefore not *Brady* material;

---

[6]Marty testified that he saw Dr. West's files on Owens, but he did not read every page carefully. Thus, it is not absolutely certain that Marty knew of all the potential impeachment evidence when he interviewed West. Nevertheless, Marty's knowledge goes only to whether his performance was deficient, not to prejudice.

and 2) Owens could have put on other evidence about the affair, but did not, and therefore was not prejudiced by not receiving the notes. The state court's conclusion that the materials are not favorable is dubious, but the district court correctly denied habeas based on a finding of no prejudice.

A

*Brady v. Maryland*, 373 U.S. 83 (1963), obligates the government to turn over evidence that is both favorable to the accused and material to guilt or punishment. "There are three components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Prejudice in the *Brady* sense means the same as in the *Strickland* sense: a reasonable probability that there would have been a different result had the evidence been disclosed. *Kyles v. Whitley*, 514 U. S. 419, 434 (1995).

Critical to *Brady* is the rule that:

> *Brady* obviously does not apply to information that is not wholly within the control of the prosecution. There is no *Brady* violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose.

*Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (internal citations and quotations omitted). This rule makes sense because if the defendant could have presented similar evidence to prove the same point that the allegedly-suppressed information would have been introduced to prove, but did not, it is not reasonably probable that government disclosure would have led to a different result.

B

Owens specifically requested all evidence about Ronald's "extra-marital affairs," and said that she had "good reason" to think that letters discussing those affairs were found among Ronald's possessions when the police searched Ronald's office and seized much of the evidence they found there. The record does not make clear the precise history of who possessed the letters and when they did so. The murder occurred on February 17, 1985. The police report shows that the next day, the officers found several notes and cards to Ronald from Gala Scott in Ronald's office. Police Chief Wray testified at the post-conviction hearing that these "notes" were sexual in nature. The police report shows that police interviewed Gala Scott the next day, and Scott admitted to the affair.

Wray testified that the police took the notes from Scott "back to our office." After "some time," Gala Scott asked for them back. The police checked with an unknown city attorney, who said that the letters were irrelevant, and then returned the letters to Scott. It is not clear when this call was made, or which attorney said that the letters were not relevant, but it is clear that the letters were never in the possession of the prosecutor.

When Owens filed her request, the prosecution told the court that it had turned over "everything we have in the way of any kind of physical evidence." While this may have been technically true because the prosecutors never handled the letters, it was not true for purposes of *Brady*. *Brady*'s disclosure requirement includes not just information in the prosecutor's files, but "information in the possession of the law enforcement agency investigating the offense." *Jamison v. Collins*, 291 F.3d 380, 385 (6th Cir. 2002). These letters were at one time in police possession, but whether by accident or on purpose, those letters were never shown to Owens.

C

The state court of appeals, in its post-conviction ruling, concluded that no *Brady* violation occurred because the letters were not favorable evidence. This ruling is questionable. There is a longstanding, commonsense belief in our culture that people who kill their spouses because of infidelity are not as morally culpable as other murderers. Owens points to Tennessee cases where marital infidelity reduced a murder to "something less than a death penalty case." *See* Petr.'s Reply Br. 7 (collecting cases). On the other hand, these cases are all "heat of passion" cases where the killing took place immediately, in person, and upon discovery of the infidelity instead of weeks later, in cold blood, and second hand through a hired killer. Owens's counsel also suggested that the evidence could have given the jury a stronger motivation to impose the death penalty because it would have looked like blaming the victim and might have reinforced Owens's guilt in the jury's mind. Furthermore, the district court observed that the specific contents of the letters:

> would be of questionable relevance to Petitioner's case in mitigation because aspects of her husband's affair that she did not know about cannot be said to have affected her state of mind and are therefore not probative of her contention that her husband's affair drove her to precipitate his murder.

Nevertheless, we will resolve this point in Owens's favor and assume that the letters contained favorable information and reject her claim on the ground that she suffered no prejudice.

Owens knew that Ronald was having an affair with Scott. Her brief attempts to transmute that "knowledge" into a mere "suspicion." (Petr.'s Br. at 66). This is a futile task, because her own habeas petition admits that "she [Owens] received an [anonymous] letter made up of words cut out of a magazine telling her that everyone but Ms. Owens knew that Mr. Owens was having an affair with Ms. Scott." The petition also relates an incident where Owens caught Scott and Ronald together in a parking lot, and Ronald reacted in a hostile manner when so confronted. Owens's petition also claims that this very incident of catching them together prompted Owens to hire the hitman. Owens *knew* of the affair, and if she wanted to present evidence of the affair, she could have testified, produced the anonymous letter, or subpoenaed Scott.[7] Owens "knew or should have known the essential facts permitting h[er] to take advantage of any exculpatory information," and the evidence she wanted was clearly "available . . . from another source." *Coe*, 161 F.3d at 344.

Owens responds that even if she knew of the affair, she needed the letters to prove the affair to the jury. She analogizes to *Brady* itself, where the defendant knew that he did not kill the victim, but did not know about the confession from his co-defendant that would have permitted him to prove his innocence. But even if we accept Owens's distinction between knowledge and proof, she still loses because the proof she needed was available elsewhere. At minimum, she could have subpoenaed Gala Scott. *Coe* explained that when the defendant "had as much access as the police" did to the relevant witnesses, the information is "not under the sole control of the government." *Coe*, 161 F.3d at 344.

Owens's final argument is that if she had called Gala Scott, Scott would have lied and offered testimony harmful to Owens. Owens's argument amounts to a concession she had some evidence of her husband's infidelity coupled with an assertion that she did not raise the infidelity issue because

---

[7]Indeed, it is not clear from the J.A. whether the police had already given the letters back to Scott when Owens filed her request. If they had already done so, the relevant evidence would not merely be "available . . . from another source," *Coe*, 161 F.3d at 344, but *only* available from another source. This would weaken, if not destroy, Owens's *Brady* claim as to the letters. The police report, which is far less helpful to her, was in police possession the entire time and would remain *Brady* material. Given the uncertainty, we will assume that the police still had the letters when Owens filed her request.

she considered her evidence too weak, but she would have raised the issue if she had stronger evidence.

The first problem with Owens's argument is that she offers no evidence that Scott would have refused to testify, no evidence that Scott would have committed perjury, and no evidence that she has even tried to contact Scott at any point in this litigation. Scott acknowledged the affair to the police, which suggests that she was not taking a position of outright denial. It is Owens who must prove prejudice, and she cannot do so without evidence.

The second problem is that Owens's argument contradicts our cases because *Brady* does not apply when the defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory information." *Coe*, 161 F.3d at 344. In *Puertas v. Overton*, 168 F. App'x 689 (6th Cir. 2006), we denied a habeas petition based on the prosecution's failure to turn over a state report on corruption within the police department that investigated the defendant. *Id.* at 698. The petitioner complained that because he did not have the report, he was not able to interview and call witnesses who might have disproved some of the evidence against him. We rejected his claim because the record showed that he "knew of these allegations [of corruption] before trial" but did not follow up with any of these potential witnesses. *Ibid.* In *Matthews v. Ishee*, 486 F.3d 883 (6th Cir. 2007), we repeated the rule that *Brady* does not apply when the information is available from another source, and denied the petition because the information not disclosed could have been deduced by looking at public records. *Id.* at 891.

The most relevant case is another death penalty habeas case, *Benge v. Johnson*, 474 F.3d 236 (6th Cir. 2007). There, the petitioner claimed that police did not disclose a statement that one witness, Fuller, made to the police that could have been used to impeach the statement of Shields, another witness, that the petitioner had confessed to the murder. *Id.* at 242. The court rejected the *Brady* claim, ruling that "[i]f Benge believed that Shields was lying, . . . Benge could have called Fuller as a witness to testify about the night in question and thus contradicted Shields." *Id.* at 243. Thus, Benge "knew the essential facts permitting him to take advantage of what Fuller may have been able to say on the subject because he knew that Fuller was in the house that night." *Ibid.* Identical reasoning applies here. Owens did not have Scott's letters to Ronald, just as Benge did not have Fuller's statements to the police. But both petitioners knew the underlying facts and could have called the witnesses, but did not.

Owens's suggestion that Gala Scott might have committed perjury is equally applicable to the witness in *Benge*. Perhaps we would have ruled differently on Owens's *Brady* claim if we were the state court, but we are not the state court. We may grant relief only if Owens's claim passes the "substantially higher threshold," *Shriro*, 127 S. Ct. at 1939, of AEDPA deference. In that role, we follow *Benge* and hold that the state court did not unreasonably apply *Brady*.

V

Owens claims that the state violated her right to present mitigating evidence when it refused to let her introduce evidence that she had been willing to accept the state's offer of a life sentence in return for a guilty plea. On direct review, the Tennessee Supreme Court rejected this claim. The district court concluded that this decision reasonably applied *Lockett v. Ohio*, 438 U.S. 586 (1978). The district court is correct because Owens offers no case holding that a state court should have admitted evidence of this nature; indeed, a case from the Eighth Circuit, which she cites, affirmed a state court decision to exclude such evidence.

A

In *Lockett*, a plurality of the Supreme Court said that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering,

*as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Id.* at 604 (plurality opinion).  As a constitutional requirement, this rule trumps other limits on admissible evidence, such as hearsay.  Yet the Court qualified this broad statement with a footnote stating that "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 604 n.12.

The Court adopted the *Lockett* plurality in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), holding that in a capital case, the sentencer cannot refuse "to consider, as a matter of law, any *relevant* mitigating evidence." *Id.* at 114. *Eddings* also confirmed that the question is not merely one of general mitigating relevance, but of relevance to "any aspect of the defendant's *character* or *record* or any *circumstances of the offense*." *Id.* at 110 (emphasis added).  At capital sentencing hearings, as elsewhere, "relevant evidence" means evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Tennard v. Dretke*, 542 U.S. 274, 284 (2004).

Although Owens is right that these cases permit defendants to introduce any *relevant* mitigating evidence, she is wrong to assume that they make all evidence automatically relevant because *Lockett* "does not mean that the defense has *carte blanche* to introduce any and all evidence that it wishes." *United States v. Purkey*, 428 F.3d 738, 756 (8th Cir. 2005).  Footnote 12 in *Lockett* explicitly stated that lower courts could continue to exclude as irrelevant evidence not bearing on the defendant's character, prior record, or the circumstances of the offense. *Lockett*, 438 U.S. at 604 n.12.  The Supreme Court confirmed that *Lockett* did not make all evidence automatically relevant when it relied on this footnote to hold that courts may exclude certain evidence from capital sentencing hearings as irrelevant.  For example, in *Oregon v. Guzek*, 546 U.S. 517 (2006), the Court unanimously held that a defendant has no right to present new evidence of his innocence at the sentencing hearing even though the defendant claimed that the evidence related to the "circumstances of his offense." *Id.* at 523–24; *see also Blystone v. Pennsylvania*, 494 U.S. 299, 306–07 (1990) (no right to jury instruction encouraging jury to weigh lack of severity of aggravating factors as a mitigating circumstance); *Franklin v. Lynaugh*, 487 U.S. 164, 174 (1988) (plurality opinion) ("residual doubt" as to defendant's guilt not a circumstance of the offense).  Our circuit recognized that *Lockett* permits courts to exclude irrelevant evidence at capital sentencing hearings and quoted footnote 12 when it affirmed a Tennessee court's decision to exclude from a capital sentencing hearing videotaped interviews in which psychologists discussed the defendant's alleged multiple personality disorder. *Alley v. Bell*, 307 F.3d 380, 392, 399 (6th Cir. 2002).

B

As mentioned above, the prosecution offered Owens and Porterfield a life sentence in return for  a guilty plea, but conditioned the plea on both defendants' acceptance of the offer.  Owens wanted to accept the deal, but Porterfield refused to plead, so the prosecution withdrew the offer.  Owens sought to present evidence that she wanted to accept the prosecution's offer at her sentencing hearing, but the state court refused to allow her to tell the jury about the failed plea negotiations.

On direct appeal, the Tennessee Supreme Court cited both the general principle in *Lockett* and the language in footnote 12 before concluding that Owens's "interest in accepting a plea bargain offer is not relevant either to the issue of punishment or to any mitigating factor raised by the defendant, and was in our opinion properly excluded."  In the state habeas proceedings, the state court cited the Tennessee Supreme Court's opinion, and added that Owens's "confession was entered at trial, so proof that [she] had accepted responsibility was already before the jury."  While the state courts offered only a truncated analysis, they did not unreasonably apply clearly established federal law.

C

Owens's best argument is that the evidence is relevant to the positive character trait of "acceptance of responsibility." While "acceptance of responsibility" could be a reason for mitigation, Owens's proffered evidence shows no such acceptance. She did not offer to plead guilty unconditionally, which she could have done. Instead, she agreed to plead guilty only if guaranteed a life sentence in return. Offering an unconditional guilty plea, contrary to the dissent at 28, would not have been volunteering for death or accepting the *lex talionis*. It simply would have accepted responsibility, and her punishment then would have been in the hands of the jury, just as it ultimately was. Thus, she was less interested in accepting responsibility and more interested in avoiding the electric chair, a motivation that is much less persuasive as a mitigating factor. It is telling that prior to trial she argued that the court should enter her guilty plea — despite the breakdown of negotiations with the state and over its objection — only because "this case carries the ultimate [punishment,] death by electr[o]cution" and because Owens "wants this matter done with and over with," but not because she had accepted responsibility for her crime. She did not offer any other evidence of acceptance of responsibility or, as the district court noted, take the stand to "express remorse or contrition in hopes of mitigating her sentence . . . to the jury directly" even though she could have done so.[8]

The failed negotiations are not related to Owens's "record." Likewise, they are not related to the "circumstances of the offense" because the plea offer says nothing about how the murder was committed. Owens posits that the offer is relevant to the circumstances of the offense because it suggests that the prosecution did not think that her crime deserved a death sentence. This is speculation on her part because the record does not explain whether the prosecution made the offer because it saw her as unworthy of death or for some other reason such as the efficient use of prosecutorial resources. Owens attempts to treat "circumstances of the offense" as a catch-all category to present any mitigating evidence she wishes to present, but the Supreme Court has not treated "circumstances of the offense" in such a haphazard manner. *See Guzek*, 546 U.S. at 523–24; *Blystone*, 494 U.S. at 307; *Franklin*, 487 U.S. at 174.

Owens cites multiple cases that speak of the relevance of a defendant's acceptance of responsibility, but none of them are on point because none involve the specific situation where the defendant wants to plead guilty on condition of receiving a life sentence, the prosecution withdraws the offer, and the defendant then wants to present the failed negotiations to the jury. Some of Owens's cases are irrelevant because they address situations where the government accepted the defendant's guilty plea instead of rejecting it. *See, e.g.*, *Bradshaw v. Stumpf*, 545 U.S. 175, 185–86 (2005); *St. Pierre v. Walls*, 297 F.3d 617, 623 (7th Cir. 2002). Other cases she cites, like *Davis v. Coyle*, 475 F. 3d 761 (6th Cir. 2007), do not mention acceptance of responsibility or plea agreements at all.

Unfortunately for Owens, the cases that are squarely on point reject her theory—even though she cites some of them as supporting her theory. Owens cites *Riley v. Cockrell*, 339 F.3d 308 (5th Cir. 2003), for a rule that "acceptance of a guilty plea was mitigating evidence that could have been presented at sentencing." (Petr.'s Reply Br. 13). But we cannot see how *Riley* helps Owens's argument because *Riley* denied a certificate of appealability to a death row inmate who wanted to argue that his trial counsel was ineffective for not arguing that the inmate's guilty plea constituted

---

[8]Owens contends that the Tennessee Supreme Court's conclusion that her failed plea bargain was "not relevant to any mitigating factor raised by the defendant" is circular because the plea bargain *was* the mitigating factor she was seeking to raise. (Petr.'s Reply Br. at 15). The problem with the argument is that Owens could have offered other evidence of acceptance of responsibility but she did not do so. The government introduced Owens's post-arrest confession at trial, in which she initially denied intent to kill her husband and admitted only to hiring people to "rough him up."

mitigating evidence. *Id.* at 317–19. *Hall v. Luebbers*, 341 F.3d 706 (8th Cir. 2003) is the only federal court of appeals case we can find[9] that specifically considers failed plea negotiations under *Lockett*. Owens ironically cites *Hall* in support of her argument, but *Hall rejected* the capital defendant's claim that "the trial court violated his Eighth and Fourteenth Amendment rights by excluding evidence of Hall's willingness to plead guilty." *Id.* at 717. In *Hall*, the defendant agreed to plead guilty if the state would recommend a life sentence. But the state conditioned the agreement on Hall's passing a polygraph test, and when the test results were inconclusive, the state revoked the offer. *Id.* at 715. Hall wanted to present evidence of the failed plea negotiations to the jury, but the court held that *Lockett* did not require the evidence to be admitted and added that even if the evidence should have been admitted, its exclusion was "harmless beyond a reasonable doubt." *Ibid.*

In *Ross v. State*, 717 P.2d 117, 122 (Okla. 1986), which the district court cited as the only case it could find on point, reached the same conclusion. It directly held that a capital defendant had no right to present, as mitigating evidence, a negotiated plea agreement that was later withdrawn. *Ibid.* In *Bennett v. State*, 933 So. 2d 930, 953 (Miss. 2006), the defendant argued that the trial court should have permitted him to present evidence that he had been offered a plea bargain in return for a life sentence. The Supreme Court of Mississippi rejected the defendant's interpretation of *Lockett*, observing that the defendant "failed to cite a single case holding that plea bargains must be admitted at sentencing." *Ibid.* Numerous other state supreme courts have also concluded that failed plea negotiations are not admissible at capital sentencing hearings. *Howard v. State*, 238 S.W.3d 24, 47 (Ark. 2006) (holding, in context of ineffective assistance claim, that "*Lockett* did not hold that plea offers are admissible as mitigating circumstances"); *Neal v. Commonwealth*, 95 S.W.3d 843, 852 (Ky. 2003) (plea offer not admissible as mitigating evidence at capital sentencing hearing under *Lockett*); *State v. Morganherring*, 517 S.E.2d 622, 639–40 (N.C. 1999) (same); *Wisehart v. State*, 693 N.E.2d 23, 64–65 (Ind. 1998) (same); *People v. Zapien*, 846 P.2d 704, 739 (Cal. 1993) (same); *Wiggins v. State*, 597 A.2d 1359, 1370 (Md. 1991) (same), *reversed on other grounds* by *Wiggins v. Smith*, 539 U.S. 510 (2003).

*Ross* also explained why a defendant's thwarted desire to accept a plea should not be admitted at capital sentencing cases.

> Allowing a defendant to use plea negotiations in mitigation would clearly discourage plea negotiations in capital cases as prosecutors would correctly fear that during the second stage proceedings, they would be arguing against themselves. Plea bargaining is to be encouraged, not discouraged, and therefore is improper evidence to present in mitigation.

*Ross*, 717 P.2d at 122. This reasoning persuades us, and explains why every court to hear Owens's argument has rejected it. We repeat that under Supreme Court precedent Owens can prevail only if the state courts unreasonably applied clearly established federal law. *(Terry) Williams*, 529 U.S. at 411–12. A rule of federal law cannot be clearly established when it has been *rejected* by every court that has been asked to adopt the rule, and a state court does not unreasonably apply clearly established federal law when it rejects an argument that has been unanimously rejected by other courts. Owens's real complaint is that the Tennessee Supreme Court did not expand *Lockett*, but that is not the standard we are duty-bound to apply.

---

[9] A federal district court concluded in *Jeffers v. Ricketts*, 627 F. Supp. 1334 (D. Ariz. 1986), *reversed on other grounds by Lewis v. Jeffers*, 497 U.S. 764, 777 (1990), that if the capital defendant had presented evidence of failed plea negotiations, that evidence should have been considered. *Id.* at 1358–59. However, we do not consider *Jeffers* even persuasive because that case was decided before AEDPA.

VI

For many of the points of the dissent, a careful examination of the relevant part of this opinion, and the cases and portions of the record cited therein, suffices for refutation. Taking the last issue in this case first, for the contrast between the dissent's claim that Owens is entitled to present "any relevant evidence," Dissent at 28, and the Supreme Court's statement that Owens is entitled to present evidence relevant to "any aspect of [her] *character* or *record* or any *circumstances of the offense*," see *Eddings*, 455 U.S. at 110. For proof that the state court's refusal to allow Owens to present evidence of the failed plea negotiations did not violate clearly established federal law, contrast the cases cited in part V.C. of this opinion that have rejected the specific argument that Owens is making with the dissent's failure to cite a single case that has accepted Owens's specific argument.

Moving to the question of ineffective assistance of counsel, for refutation of the dissent's contention that the majority has "singular[ly] reli[ed]" on *Schriro*, see the cases cited in part III.D. of this opinion. For refutation of the dissent's claim that Owens "did not even refuse to cooperate" with her attorney, Dissent at 25, see pages 5–6 of this opinion, where we detail, with extensive citations to the record, Owens's non-cooperation. For refutation of the dissent's characterization of this opinion as saying that trial counsel were justified in abandoning the domestic violence defense based on Owen's refusal to testify herself, see the discussion, at page 5, of Owens's refusal to cooperate with the state mental health examiners and her refusal to let trial counsel interview her family. Note that the majority relies not only on testimony from Owens's trial counsel, but on testimony from Owens's own sister that Owens had ordered her counsel "not to involve [the family] in any way" with the trial. The dissent appears to find that this testimony does not exist. Likewise, for refutation of the dissent's unsupported assertion that trial counsel were too incompetent to obtain a mental health expert to testify to Owens's mental condition, Dissent at 26–27, see footnote 2 of the majority opinion. Finally, the dissent quotes at length from statements in Owens's brief that rely on Eric Gentry's report, Dissent at 25–26, and refers to Gentry as "an expert in the field." Dissent at 27. For an explanation of why Gentry's testimony should not be accepted uncritically, see the majority opinion at 7–8.

As to the *Brady* issue, the dissent claims that the majority has held that if a defendant has "reasonable suspicion of a fact, the defendant is not entitled to exculpatory evidence regarding that fact . . . ." Dissent at 23. For refutation of this claim, see the majority opinion, which does not include the phrase "reasonable suspicion," and see pages 14–15 of the majority opinion, which explains that in this case, Owens *knew* of the affair. And for refutation of the dissent's claim that the majority's rule is somehow novel or "nonsens[ical]," see the cases, including *Coe*, *Matthews*, and *Benge*, cited in the majority opinion at page 15 and not refuted by the dissent.

A few of the dissent's arguments require a more detailed answer.

First, the entire premise of the dissent's rhetoric is that counsel were obviously incompetent for not relying on what is called, in parts of both my state and that of the dissenter, the "he just needed killing" defense. While it could be true that a counsel of the dissenter's skill could have sold a jury on that defense, there are many reasons that counsel could have thought otherwise – and making such a choice is the essence of a "strategic" choice.

* Unlike the classic case of killing a spouse taken "in flagrante," the evidence here was that Mrs. Owens cooly interviewed a series of potential hitmen, hired and funded one of them, and provided him with information vital to his ability to kill Mr. Owens by savagely pounding his head and brains into a pulp. She then initially denied any murderous intent, and then excused her involvement because "we've just had a bad marriage over the years . . . ." It seems plausible that

competent counsel might have believed that the jury would take a less sanguine view of the situation than does the dissent.

* Ms. Owens at trial did not admit to carrying through with the murder plot, a position quite at variance with the hypothesized defense that the deceased (and thus the now legally as well as physically defenseless) Mr. Owens deserved killing.

* Despite the fulminations about the defense knowledge of evidence of savage abuse, that evidence rests wholly on what are said to be Ms. Owens's statements at a pretrial time. In fact, the pre-trial hearing referenced by the dissent at page 22 actually reads:

Court: you got medical proof?

Mr. Marty: we have *her* proof, your Honor.

Court: Do you have medical proof?

Mr. Marty: No.

Court: Did she seek medical services?

Mr. Marty: No, she did not.

Which is, of course, fully consistent with her contemporaneous statement to the police that "there was very little physical violence." All of the other information as to abuse cited in the dissent at pages 25–26 comes from Gentry's report (not from direct testimony by Owens) generated many years after the trial.

Some attention should be paid to the dissent's extremely vigorous attack, at page 25, on the defense counsel's timekeeping practices, wherein his testimony (see pages 6–7) as to a failure to record (and thus to try to bill for) every second of time spent, when examined many years after the event, is referred to as "ludicrous," and it is said that he "lied to the court" and acted in violation of "his integrity and honesty."

Having examined many vouchers for billing in CJA cases, I believe that it is certainly not unheard of for a counsel to say that he has not billed for all time spent, and thus will take a reduced fee. *Over*-billing is justifiably harshly condemned, but I have never heretofore seen a failure to claim, by contemporaneous records, every second spent attacked in such terms.

## CONCLUSION

All three of Owens's habeas claims fail. The judgment of the district court denying her habeas petition is AFFIRMED.

———————————

**DISSENT**

———————————

MERRITT, Circuit Judge, dissenting. The majority opinion slants and misconceives relevant facts and law in this case on each of the three major issues in order to uphold the death penalty. I will try to straighten out the case for the reader by introducing the actual facts and the correct legal principles to be applied. This is not a close case.

The facts about Ryan Owens' cruel and sadistic behavior toward his wife now make an overwhelming case of domestic violence and psychological abuse in mitigation of the murder case against Gaile Owens. From the beginning, Mrs. Owens' counsel knew that this was her best — indeed, her only — defense. Before trial, her counsel told the trial court that in his opinion: "This case has a meritorious defense in the battered-wife syndrome." (App. 120.) The Memphis district attorneys obviously knew that this was the defense theory. But this defense was never developed or even mentioned to the jury during the trial because of the cover-up of exculpatory evidence by the Memphis prosecutor and the complete failure of defense counsel to conduct a proper investigation of Ryan Owens' sadistic behavior toward his wife. I will discuss the Memphis prosecutor's cover-up of exculpatory evidence first, then defense counsel's failure to investigate and develop the defense, and finally the refusal of the Memphis trial court to allow in evidence one of the defendant's best lines of mitigation testimony.

### I. The State Withheld Crucial Exculpatory Evidence of Mr. Owens' Infidelities

Prior to trial, Mrs. Owens requested that the state prosecutor provide the defense with all information in its possession that her husband "had numerous girlfriends, extra-marital sexual affairs involving unusual sexual proclivities and/or perversions" because "these proclivities, perversions and affairs were flaunted and visited upon defendant with such regularity and in such ways as to contribute to [her] state of mind and mental condition . . . ." (App. 101.)[1] The prosecution had found sexually explicit love letters between Mr. Owens and one of his girlfriends, Gayla Scott. In the love letters, the two called each other "fluff licker" and "lollipop," a clear reference to numerous oral sexual experiences between Ryan Owens and Gayla Scott. (App. 412-413.) The detectives had written up their discovery of the love letters in a contemporaneous report describing them to the prosecution. The prosecution covered up the love letters while lying to the trial court and to opposing counsel in the following language: "To the best of my knowledge we have shown them every single scintilla of evidence which we seized and which we have that came from the house. Anything that is in the possession of any law enforcement agency we have shown to counsel for the defense." The prosecutor went on to further the cover-up by saying to the trial court and Mrs. Owens that "everything we have in the way of any kind of physical evidence, any piece of paper, any notebook — anything along those lines, letters and etc. that we have, we have made available to them." (App. 111-115.) This set of falsehoods is typical of the conduct of the Memphis district attorney's office during this period. *See Cone v. Bell*, 492 F.3d 743, 759 (6th Cir. 2007) (Merritt, J., dissenting), *cert. granted*, 76 U.S.L.W. 3484 (U.S. June 25, 2008) (No. 07-1114).

To the obvious prosecutorial falsehoods in this case, the majority opinion can only lamely answer that Mrs. Owens already knew that her husband, Ron Owens, was having affairs so that any

———————————

[1] Obviously my colleagues are in error that Mrs. Owens did not cooperate at all with her lawyer. From these statements in the pleadings, it is clear that she advised her lawyer in detail of her treatment and suspicions and was willing to be of assistance. She fearfully and simply (though mistakenly) said she did not want to testify. The fact that she wanted him to talk to "her grandfather or mother or father," which he failed to do, J.A. 395-96, defeats the majority's claim that she prevented her lawyer from talking to her family or developing the wife-abuse defense.

documents and letters would not have been favorable or prejudicial because she herself could have testified to those facts herself. The majority argues that if a defendant has knowledge of any fact, or a reasonable suspicion of a fact, the defendant is not entitled to exculpatory evidence regarding that fact because she could testify regarding that fact herself. (My colleagues state their proposed rule as follows: "Owens knew of the affair, and if she wanted to present evidence of the affair, she could have testified . . . . She loses because the proof she needed was available elsewhere." Opinion, pp. 14-15.) The majority's proposed rule is nonsense. In *Brady v. Maryland*, 373 U.S. 83 (1963), the defendant, Brady, had knowledge that he did not kill the victim, but had no documentary evidence to support that knowledge or to support his view of the identity of the real culprit. Under the theory of the majority in the instant case, Brady was not entitled to any documentary evidence in the hands of the prosecution that would support any knowledge that Brady already had. Instead, according to the rule announced by my colleagues, Brady should have taken the stand and testified about his knowledge or put the real culprit on the stand and examined him. This argument is directly contrary to the Supreme Court's holding in *Brady*. The Court specifically held that Brady's knowledge that his co-defendant committed the crime obviously did not satisfy the prosecution's responsibility to provide specific information that it had regarding the co-defendant's guilt. *Id.* at 87.

The prosecution offered Owens life imprisonment (conditioned on the guilty plea of her confederate) because the killing under these mitigating circumstances — circumstances the jury never heard about at all — made her less culpable. The jury never heard the evidence in the hands of the prosecution that made her less culpable because the prosecution consciously and deliberately covered it up. And now my colleagues say "fine, no problem, she should have taken the stand."

Rather than tell the jury the truth about the matter, the prosecution told the jury that she killed her husband to get "insurance money." (App. 151-51.) On this issue, Owens' post-conviction counsel concludes in her reply brief:

> The prosecution's theory, however, would have held no sway had the prosecution complied with its constitutional obligations to disclose the letters between Gala Scott to Ronald Owens. Indeed, had the jury held in their hands the exculpatory pile of letters from Gala Scott, the jury would have seen the circumstances of the offense in a very different light. The jurors would have actually understood the "cruelty" which Gaile Owens said she endured, they would have been sickened by the whole ordeal, and they would have understood the real truth behind what happened to Ronald Owens. With the actual production of the letters, and with those letters being sent back to the jury room, reasonable jurors would have returned the very sentence which the prosecution said was appropriate for Gaile Owens: Life.

(Appellee's Reply Br. 8-9.) This may or may not have been the result of the trial in Memphis, but it is certainly true that the blatant prosecutorial misconduct suppressing the love letters was highly material and prejudicial at the mitigation phase of the trial. To claim otherwise is to deny the obvious. Note that my colleagues cannot deny that the abused-wife defense was her best defense or that her lawyer offered no proof along this line — in part because the prosecutor covered it up but also because her lawyer did not do his job.

## II. Ineffective Assistance of Counsel

My colleagues' proposed disposition of Owens' ineffective assistance of counsel claim is also slanted in favor of the State both as to the facts and the law. Their proposed rule, stated in italics on page 15, is that notwithstanding Owens' strong case of spousal abuse, her ineffective assistance claim based on counsel's failure to investigate and develop the defense fails "because Owens' counsel wanted to present the substance of such evidence directly at trial, through the testimony of Owens and her family." In other words, my colleagues postulate when she told her lawyers she did not want

to testify herself, they were justified in completely abandoning her domestic violence and spousal abuse claim — the claim they had earlier told the court was a "meritorious defense." The complete abandonment of that defense left the jury only with the prosecutor's theory that her motive for killing her husband was the "insurance money."

In a long series of cases, the Supreme Court, the Sixth Circuit, and other circuits have held that in order to comply with the Sixth Amendment, defense counsel in capital cases must at least meet the American Bar Association Guidelines For The Appointment and Performance of Defense Counsel in Death Penalty Cases.[2] Those Guidelines clearly state that defense counsel must fully investigate all mitigating circumstances, even when the defendant does not want to take the stand or is not forthcoming. Section 10.7 on "Investigation" instructs counsel as follows:

**Guideline 10.7          Investigation**

A.          Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.

> 1.          The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.

> 2.          The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.

. . . .

*Penalty*

Counsel's duty to investigate and present mitigating evidence is now well established. *The duty to investigate exists regardless of the expressed desires of a client. Nor may counsel "sit idly by, thinking that investigation would be futile."*

---

[2]In addition to the ABA Guidelines, quoted in the text, both the Supreme Court and the Sixth Circuit have held that an obstinate client was no excuse for failing to perform a complete investigation. *See Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (holding that counsel was ineffective for failing to examine the client's court file on a prior conviction despite the fact that the client's "own contributions to any mitigation case were minimal" and the client sent his counsel "off on false leads"); *Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005) (quoting *Coleman v. Mitchell*, 268 F.3d 417, 449-50 (6th Cir. 2001)) ("[D]efendant resistance to disclosure of information does not excuse counsel's duty to independently investigate."); *Hamblin v. Mitchell*, 354 F.3d 482, 492 (6th Cir. 2003) (reversing the district court for stating that counsel cannot be ineffective when counsel is simply following a defendant's wishes not to investigate); *cf. Fautenberry v. Mitchell*, 515 F.3d 614, 650 (6th Cir. 2008) (Moore, J., dissenting) (providing a thoroughly researched argument against the majority that counsel's deficiencies should be not excused simply because of the client's uncooperative behavior).

That counsel may not abdicate the duty to investigate simply because the client did not actively support the mitigation case has been supported by the holdings of other circuits, as well. *See Avila v. Galaza*, 297 F.3d 911, 921 (9th Cir. 2002) (holding counsel deficient for failing to investigate whether the client's brother was the real shooter despite counsel's belief that such an investigation would have "go[ne] against the wishes of [the client] and his family"); *Blanco v. Singletary*, 943 F.2d 1477, 1501-03 (11th Cir. 1991) (holding counsel ineffective for "latching onto" client's assertions that he did not want to call penalty phase witnesses); *Martin v. Maggio*, 711 F.2d 1273, 2380 (5th Cir. 1983) (holding that defendant's instruction "that his lawyers obtain an acquittal or the death penalty" did not justify his lawyers' failure to investigate the intoxication defense).

My colleagues grossly misstate the case law on this subject.

> *Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation with respect to both phases of the case.*

(Emphasis added.)

The Sixth Amendment requires a comprehensive investigation, as the cases discussed in footnote 2 explain. My colleagues' singular reliance on *Schriro v. Landrigan*, 127 S. Ct. 1933 (2007), for the proposition that counsel could completely abandon investigating and using domestic violence and psychological abuse as "a meritorious defense" demonstrates the majority's effort to alter the governing standard in order to affirm the death penalty. In *Schriro* the Supreme Court found that the defendant specifically instructed counsel "not to present any mitigating evidence," *id.* at 1941, and thus distinguished *Wiggins v. Smith* and *Rompilla v. Beard*. The Supreme Court distinguished *Wiggins* and *Rompilla* only on the ground that in those cases "the defendant refused to assist in the development of a mitigation case, but did not inform the court [as in *Schriro*] that he did not want mitigating evidence presented." In Gaile Owens' case she did not even refuse to cooperate, much less instruct counsel not to put on mitigating evidence. My colleagues cannot legitimately hide behind the *Schriro* case and use it to construct a rule that counsel can abandon any investigation and development of spousal abuse when the defendant is reticent to take the stand.

Defense counsel's time sheets and his certified representation to the state court showed that counsel abandoned the investigation of the defense — spending a total of only two hours of investigation in preparation for the mitigation or sentencing phase of Mrs. Owens' case. The majority speculation that these statements of defense counsel to the court were false is ludicrous. Counsel was required by law to "certify that the foregoing [two hours of time] represents an accurate and complete statement of time and expense in connection with the above action." (App. 251-59.) The majority's assumption that counsel lied to the court in a written certification and in fact spent long hours of investigation for the sentencing hearing is inexplicable. Counsel had no incentive to falsify his investigation and every reason to tell the truth. His pay depended upon the hours of investigation spent, and his integrity and honesty depended upon his telling the truth.

Had counsel performed a full and complete investigation as required by the ABA standard quoted above and adopted by the Supreme Court, here is the evidence that counsel would have found and could have presented to the jury:

> Ron Owens was abusive toward Ms. Owens. He subjected her to physical, emotional, and sexual abuse beginning with their wedding night when he was forceful and impatient, demanding sex immediately upon entering their hotel room. When Ms. Owens revealed to her new husband that she was in great pain and bleeding profusely, he called her frigid, and angrily left the hotel room stating that "If you won't, I know where I can find someone who will." R. 17, Addendum 12: PCR, Vol. 7, Ex. R, pp. 9-10; Apx. pp. 340-341.

> Ron. Owens inserted large objects into Ms. Owens's vagina and rectum, causing her pain and bleeding. At one point, Mr. Owens inserted a wine bottle into Ms. Owens's vagina and manipulated it with such vigor that it broke inside her. *Id.*, Ex. R., p. 10; Apx. p. 341. Mr. Owens also used a penis-shaped marijuana pipe to penetrate Ms. Owens's vagina which caused her pain and humiliation. *Id.*, Ex. R., p. 10; Apx. p. 341.

> Ron Owens's sexually abusive behavior not only placed Ms. Owens at risk, but also risked the life of their unborn son. The night before the birth of her second son, Ron Owens forced Ms. Owens to engage in such brutal sexual intercourse that

Ms. Owens's placenta partially detached, requiring an emergency C-section to save Ms. Owens and her son. *Id.*, Ex. R. p. 14; Apx. p. 345; *Id.*, Ex. 1, p. 32; Apx. p. 285.

Ron Owens not only sexually abused Ms. Owens, but was also emotionally abusive toward her. Upon the birth of her children, Mr. Owens accused Ms. Owens of not taking properly her birth control pills and complained that the children would be an unbearable financial burden. *Id.*, Ex. R, pp. 13-14; Apx. pp. 344-345. In addition, Mr. Owens regularly berated Ms. Owens telling her, among other things, that "she did not sweat much for a fat person." *Id.*, Ex. R, pp. 10-11; Apx. pp. 341-342.

Ron Owens was also deceitful and unfaithful to Ms. Owens. Mr. Owens had lied to Ms. Owens and to others about his background, falsely claiming that he volunteered to serve as a medic in Vietnam, and that he was shot twice and contacted Malaria while in Vietnam. *Id.*, Ex. R., pp. 11-12; Apx. pp. 342-343; *Id.*, Ex. N; Apx. p. 293; *Id.*, Ex. Q; Apx. p. 328. Moreover, Mr. Owens had lied about his credentials on a job application at Baptist Hospital, stating that he had a B.S. degree when he did not. *Id.*, Ex. R, p. 12; Apx. p. 343; *Id.*, Ex. O; Apx. p. 311.

(Final Brief of Appellant filed August 3, 2007, 11-13.) The incompetence of defense counsel in this case is well illustrated by Mr. Marty's post-trial excuse that he thought investigating and showing spousal abuse would have made the jury more likely to favor capital punishment. He testified:

Q. Mr. Marty, going back to an earlier question concerning, for instance, the report by K. D. Wray concerning the verification of an affair, sexual affair with Ron Owens, do you think that would have been important knowledge for you to have in this case?
A. It may or may not have been. It may have given her a motive to kill him.
Q. Do you think it might have been useful in sentencing, perhaps, to give the jury a reason not to kill her?
A. *It may have given them* [the jury] *a stronger reason to kill her*.

(Emphasis added.) Post-conviction counsel's answer to Marty's excuse for abandoning the investigation and offering no proof of domestic abuse is unanswerable:

[T]his killing was not worthy of the death penalty. That is the reason why the prosecution offered Gaile Owens a life sentence in the first place: A woman who kills her husband because of an affair is less culpable than other murderers. In fact, case law is replete with circumstances in which the unfaithfulness of a spouse — even if not providing a legal justification for the killing — has reduced the killing to something less than a death penalty case.[2] One can easily understand how a woman who has been cheated on, beaten, and emotionally and/or sexually abused might kill her husband and why life in prison — not death — is the appropriate sentence under the circumstances.[3]

> [2] *See, e.g.*, *State v. Thornton*, 730 S.W.2d 309 (Tenn. 1987); *State v. Whitsett*, 299 S.W.2d 2 (Tenn. 1957); *Drye v. State*, 184 S.W.2d 10 (Tenn. 1944); *State v. Reagan*, No. M2002-01472-CCA-123-CD, 2004 WL 1114588 (Tenn. Crim. May 19, 2004); *State v. McCarver*, No. M2002-00123-CCA-R3-CD, 2003 WL 22087476 (Tenn. Crim. App. Jan. 26, 2004); *State v. Belcher*, No. 03C01-9608CC00299, 1987 WL 749392 (Tenn. Crim. App. Nov. 26, 1987); *People v. Buggs*, 493 N.E.2d 332 (Ill. 1986); *People v. Carlson*, 404 N.E.2d 233 (Ill. 1980).

[3] Indeed, even this month in West Tennessee, defendant Mary Winkler was sentenced to three years in prison after being found guilty of shooting her husband in the back while her children were present in their home. Much like Mrs. Owens's allegations of sexual, physical, and emotional abuse, Ms. Winkler claimed that she was physically and emotionally abused by her husband, that he was sexually inappropriate, and that she was hiding her financial troubles from him. *See* http://www.cnn.com/2007/LAW/06/08/winkler.sentence.ap/index.ht ml, last visited June 14, 2007). *See generally*, Note, *Developments in the Law: Legal Responses to Domestic Violence, Battered Women Who Kill Their Abusers*, 106 Harv. L. Rev. 1574 (1993).

(Final reply Brief of Appellant filed August 7, 2007, 6-7.)

To make matters even worse, Mrs. Owens' appointed counsel each thought the other was responsible for conducting the sentencing hearing; consequently, neither prepared for it. (App. 387, 411.) As a result, counsel were so ill prepared that when Dr. Max West, a psychiatrist who had interviewed Mrs. Owens years earlier, began to testify about her family history, defense counsel failed to understand that the Tennessee capital sentencing statute, T.C.A. § 39-2-203(c) (now repealed), expressly made such hearsay testimony admissible at the mitigation hearing. As a result, counsel failed to point out the statute to the trial court when the prosecutor objected on hearsay grounds. The state court erroneously ruled the testimony inadmissible when defense counsel let the objection go unanswered.

Defense counsel also failed to follow the provisions of Tennessee law that would have allowed him to hire a psychologist or psychiatrist to testify that Mrs. Owens was suffering from the recognized personality disorder of "battered wife syndrome." *See* Note, *Developments in the Law: Legal Response to Domestic Violence, Battered Women Who Kill Their Husbands*, 106 Harv. L. Rev. 1574-1597 (1993). The record now contains extensive testimony from an expert in the field showing that the traumatic treatment Mrs. Owens experienced in childhood and as the wife of a sadistic husband created an intense anxiety disorder resulting in impulsive actions in conflict with her core values and beliefs. Her mental disorder includes physical manifestations such as an eating disorder causing her weight to fluctuate drastically from 100 to 170 pounds.

As a result of defense counsel's failures, the jury heard nothing, not a stitch, of Mrs. Owens' family history or the sadistic treatment she received at the hands of her husband. The fact that Mrs. Owens was so ashamed of her past that she did not want to take the stand and testify in no way excuses counsel's failure to investigate and prepare for the mitigation hearing or counsel's incompetent failure to cite the law allowing hearsay testimony in such hearings. Counsel obviously had no comprehension of the law governing sentencing hearings, did nothing to investigate mitigating facts, abandoned Owens' best defense and did not prepare at all for the sentencing hearing. If that is not ineffective assistance of counsel in a capital case, there is no such thing as ineffective assistance of counsel.

### III. The State Violated Owens' Right to Prove Mitigating Factors at the Capital Sentencing Hearing

The majority opinion repeatedly refers to Owens' offer of proof as an offer of "failed plea negotiations" and mistakenly concludes that such "failed plea negotiations" cannot constitute "mitigating evidence" within the rule allowing "any relevant mitigating evidence," established in *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982). In fact, the prosecutor argued to the jury that Owens "deserved" the death penalty because she did not acknowledge and repent her murderous

criminal behavior. Owens wanted to show that this was untrue because she had, in fact, offered to plead guilty and because the prosecutor's offer of life imprisonment was itself an admission that Owens did not "deserve" the death penalty. Thus, both her offer to plead and the prosecutor's offer of life were directly inconsistent with the prosecutor's later claim to the trial jury that she "deserved" death because she was impenitent and hard of heart. What we have here is death penalty gamesmanship on the part of the prosecution, and the jury was entitled to know what was going on. This should not be a hard concept for my colleagues to grasp.

The majority offers a hopeless, out-of-the question argument on this subject of acceptance of responsibility. The opinion says in the first paragraph of Section V.C that "Owens's proffered evidence shows no such acceptance" because she was willing to plead "only if guaranteed a life sentence" rather than "the electric chair." The majority suggests that the evidence would have been admissible and "persuasive as a mitigating factor" if she had pled guilty and accepted "the electric chair." The argument comes down to this: If Gail Owens had volunteered for "the electric chair," the "proffered evidence would show acceptance" and would have met the test of "relevant mitigating evidence" under *Eddings*, but not otherwise. My colleagues' view is that Mrs. Owens could only make her evidence of remorse and acceptance of responsibility admissible by following the Mosaic law of *lex talionis* — "an eye for an eye, a tooth for a tooth." Surely the law of admissibility of mitigating evidence in our time under *Eddings* does not turn on accepting the theory of Mosaic law as found in the Old Testament.

The law is not unclear or up-in-the-air on this subject. *Eddings* is good law, and under *Eddings* Owens is entitled to prove "any relevant mitigating evidence." Contrary to the majority's argument that her offer to plead "shows no such acceptance" of responsibility, the opposite is true. Had Owens' proof of her offer to plead guilty and the prosecution's offer of life been admitted, the jury might well have concluded that the prosecution's claim that she was remorseless and deserved death was false and that Owens' life should be spared. As with the *Brady* violation and the ineffective assistance of counsel, the majority has again stood truth on its head with its argument that Owens' offer to plead and the State's offer of life does not fall within the meaning of "any relevant mitigating evidence."