# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
February 3, 2015 Session Heard at Memphis[1]

## STATE OF TENNESSEE v. BRADLEY COX

### Appeal from the Circuit Court for Henderson County
### No. 130571    Roy B. Morgan, Judge

---

### No. W2014-00800-CCA-R3-CD  -  Filed June 17, 2015

---

The Defendant-Appellant, Bradley Cox, was convicted by a Henderson County jury of one count of aggravated sexual battery and two counts of rape of a child. The trial court sentenced the Defendant to an effective sentence of 37 years' confinement, to be served at 100% as a violent offender. On appeal, the Defendant argues that (1) he is entitled to a new trial based upon the State's failure to timely disclose certain exculpatory evidence, and (2) the evidence is insufficient to sustain his convictions. Upon review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

David W. Camp, Jackson, Tennessee, for the Defendant-Appellant, Bradley Cox.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Jerry Woodall, District Attorney General; and Angela R. Scott, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

On June 11, 2013, the Defendant was indicted by the Henderson County Grand Jury for three counts of rape of a child for three incidents involving his minor

---

[1] Oral Argument was heard in this case on February 3, 2015, at Cecil C. Humphreys School of Law at the University of Memphis in Memphis, Tennessee, as part of the S.C.A.L.E.S. (Supreme Court Advancing Legal Education for Students) project.

stepdaughter, J.C.[2]  A jury trial was held on December 18, 2013, at which the following evidence was presented.

**State's Proof.**  The victim testified that she was born on April 20, 2001, and was five years old when her adopted mother, T.C., married the Defendant in July 2006.  At the time of the incidents, the victim was living with T.C., the Defendant, and her three siblings.

The victim testified that the first incident occurred in September or October 2008.  She recalled that it was "crisp" outside, the leaves had started changing colors, and she had drawn a leaf at school.  One afternoon after the victim arrived home from school, the Defendant called her to his bedroom where he was lying on the bed.  He asked her about her day, hugged and kissed her, and pulled her onto the bed.  The victim lay on her side while the Defendant lay next to her.  He then pulled down her pants and her panties and touched the outside and the inside of her vagina, which she referred to as her "private area," with his finger.  While touching her, the Defendant told her that he loved her.  The victim testified that it hurt when the Defendant touched inside and outside of her vagina and that she kept her eyes closed during the incident.  She estimated that the incident lasted 45 minutes and recalled that after it ended, she went to the bathroom to check her underwear because she thought she had "messed [her]self."  She did not tell anyone about the incident at the time.

The second incident occurred in October 2009.  The victim recalled that it was after her birthday, and it was cold outside.  The victim was playing on the computer at her house after school one afternoon when the Defendant called her to his bedroom.  He was lying on the bed under the covers.  He asked her about her day and hugged and kissed her.  He then pulled her onto the bed and under the covers.  The victim testified that the Defendant was "already naked," and he pulled off her pants and her panties and "put his penis into [her] vagina."  The Defendant kissed the victim and told her that he loved her.  The victim testified that it "just sort of felt weird and it kind of hurt" when the Defendant put his penis in her vagina.  She estimated that the incident lasted 45 minutes.  Afterwards, she went to the bathroom and discovered "clear stuff" on her underwear.  She did not tell anyone about the incident.

The third incident occurred on December 27, 2012.  The victim testified that it was a couple of days after Christmas, and her grandmother was sick.  The victim recalled that her mother, great-grandmother, brothers, and the Defendant were at home with her that evening.  Around 11 p.m., after everyone else had gone to bed, the victim was playing

---

[2] It is the policy of this court to protect the victims of sex crimes by identifying them and their relatives by their initials only.

with her iPod while the Defendant sat in the loveseat in the living room watching television. The Defendant called the victim to the loveseat to watch television with him. While they were lying together in the loveseat, the Defendant started kissing the victim, pulled down her pants and panties, and pulled down his pants and underwear. He put his finger in her vagina and her buttocks, which "hurt" the victim, and then put his penis into her vagina. The Defendant kissed the victim and told her that he loved her. After the incident, the victim was tired so the Defendant carried her to her bed.

After the victim returned to school, she told two friends about the incidents with the Defendant. A few months later, she disclosed the abuse to her school counselor, Mr. Warren. When she arrived home from school that day, she observed a black vehicle in her driveway and a woman waiting to speak to her. The victim testified that she "knew who it was" because Mr. Warren informed her that he was "going to call people" and she "already knew all about Child Services[.]" The victim told the woman what happened with the Defendant. Thereafter, the Defendant called the victim and asked whether anyone had visited the house. The victim responded, "Yes, the Child Services lady." The Defendant asked the victim what she told Child Services, and she responded, "I told [Child Services] that . . . [y]ou had touched me inappropriately." The Defendant told the victim that she "had to lie" and she "couldn't tell that, and it was going to ruin the family and that [she] just couldn't tell anybody." The victim responded, "I'm sorry, I can't tell a lie. You've raised me not to. I can't." The Defendant continued to call the victim approximately 15 times from the time she arrived home from school until her aunt arrived at the house, repeatedly asking her why she told Child Services about the incidents and urging her to lie. He told the victim to tell Child Services that she had "misunderstood" and that he accidently touched her private area while they were wrestling. When she responded that she was not going to lie, he said, "Please [J.C.], you have to. Please." The victim did not see or speak to the Defendant again until trial.

Subsequently, the victim participated in a forensic interview and received counseling at the Carl Perkins Center for Child Abuse Prevention. She identified the Defendant in court and stated that she was "certain" he was the person that touched her. On cross-examination, the victim agreed that during the last six or eight months of her parents' marriage, T.C. and the Defendant fought a lot, which made her angry. She acknowledged that she told her grandmother that if her parents separated, she wanted to live with the Defendant. She explained that T.C. was "so unbearable" and the two "never really got along[.]" She stated that she was not afraid of the Defendant, and she "thought [she] could handle it." She agreed that she did not tell anyone about the abuse for nearly four years, explaining, "[I]t just never came up in a conversation."

Investigator David Dowdy with the Henderson County Sheriff's Office investigated the victim's case. After watching the victim's forensic interview,

Investigator Dowdy set up an interview with the Defendant. When the Defendant voluntarily came to the Sheriff's Office a few days later for the interview, his initial statement to Investigator Dowdy was "something to [the] effect" of "[I am] in trouble." Investigator Dowdy read the Defendant his Miranda rights and informed him of the allegations against him. The Defendant signed a form acknowledging and waiving his rights and agreed to talk with Investigator Dowdy about the allegations. Investigator Dowdy recalled that the Defendant was nervous and upset and that he cried periodically throughout the interview. He initially denied the allegations and claimed that the victim may have been lying due to her parents' marital problems. He later told Investigator Dowdy that the victim is "a truthful girl" and "she doesn't tell lies," and he stated that he was proud of her for telling the truth. The Defendant admitted to Investigator Dowdy that he occasionally took Ambien and recalled waking up with his hands down the victim's pants, touching her inappropriately and kissing her. Although he could not remember specifics, the Defendant said that it happened several different times, including December 27, 2012. When Investigator Dowdy asked the Defendant whether he penetrated the victim's vagina with his penis, he stated that he did not remember doing that.

After the Defendant's admission, Investigator Dowdy left the interview room to allow the Defendant to write out a statement. The statement, which was introduced into evidence and read to the jury, described the incidents with the victim as follows:

> After taking my Ambien[,] I would sometimes lie down on the loveseat or couch. Sometimes [the victim] would watch TV with me. I remember waking up on a couple different occasions and I was kissing her on the face and rubbing her inappropriately on her panties. After waking up I sent her to bed, as well as I did.

When Investigator Dowdy informed the Defendant that the victim would be given a medical examination, the Defendant said the medical findings would come back to him and stated that he would kill himself if the examination showed that she was pregnant. At that point, Investigator Dowdy advised the Defendant that he was under arrest.

Dr. Lisa Piercey, Vice President of West Tennessee Healthcare and medical director of the Madison County Child Advocacy Center, testified as an expert in child abuse. She evaluated the victim in this case and conducted a physical examination on January 7, 2013. Dr. Piercey testified that the victim had a "normal physical examination except for her genitals." The victim had an absence of the posterior rim of hymen tissue, which Dr. Piercey opined indicated penetration. She explained that this injury was a "pretty significant finding" and "pretty abnormal" because it occurs in less than fifteen percent of all sex abuse cases. Based on her findings, Dr. Piercey opined that the victim

-4-

suffered sexual abuse with "definitive evidence of blunt force penetrating trauma" consistent with the victim's disclosure of abuse. Dr. Piercey acknowledged that the victim did not show any symptoms of a sexually transmitted disease although the Defendant is a carrier of genital herpes and genital warts. She explained, however, that it is unlikely that a sexually transmitted disease spreads every time a person with the disease has sex. She further noted that genital warts is a lifelong disease and that a carrier may not show symptoms for 20 to 30 years.

On cross-examination, Dr. Piercey reiterated that "hymenal injury is actually extraordinarily rare outside of penetrating trauma" and stated that when there is an "interruption of that lower edge of the hymenal rim, it's pretty much always indicative of penetrating trauma." Dr. Piercey agreed that she did not collect any DNA evidence from the victim but explained that the incidents occurred well beyond the 72-hour time frame in which DNA evidence may have been available.

**Defense's Proof.** The Defendant testified that at the time of the alleged incidents, he was married to T.C., the victim's adoptive mother. In the last few years of the marriage, their relationship had become "pretty rocky," and the two divorced in the summer of 2013. The Defendant testified about T.C.'s prescription drug use and recalled that it would "get almost to the point where [T.C.] couldn't even speak." He acknowledged that the couple occasionally argued in front of the children and that the children asked whether the Defendant and T.C. were going to get a divorce. The Defendant testified that when he met with Investigator Dowdy, his "whole intention was just to keep [the victim] out of trouble and stuff." He adamantly denied ever having sex with the victim "in any way." When asked why he admitted to Investigator Dowdy that he inappropriately touched the victim, the Defendant stated, "[Y]ou would do just about anything to protect [your children]," and explained that he was trying to "take the heat" off of the victim.

On cross-examination, the Defendant agreed that he signed a waiver of his Miranda rights before talking with Investigator Dowdy and that he wrote out a statement admitting to inappropriately touching the victim. He claimed, however, that the statement was not true and that he lied to Investigator Dowdy to "protect [his] daughter." The Defendant testified that T.C. sent him text messages over the weekend before he met with Investigator Dowdy "coach[ing]" him and telling him, "This is what's happening, this is what you need to do. You need to say something to keep [the victim] out of trouble." The State asked whether the Defendant remembered a certain text message sent to his old phone number. The Defendant recalled the text, but he did not recall his response to this text message. The prosecutor read the Defendant's reply, "You are a wonderful person and none of this is your fault," and the Defendant agreed that he "probably said that." When asked whether this text message was his idea of T.C.

coaching him, the Defendant responded, "[I]t seem[s] like you picked and chose what you want[ed] to show me. . . . That can't be the only thing I replied to her." When asked what messages the State was "supposedly picking and choosing," the Defendant responded, "I can't remember back twelve months ago. . . . I don't have that [phone] number anymore."

The Defendant's mother and victim's grandmother, testified that she spent a lot of time with the victim. During the Thanksgiving holiday in 2012, the victim and her siblings spent four days and nights with her. She testified that the victim never told her about any incidents of mistreatment or abuse by the Defendant and stated, "[The victim] loved her dad." She testified that the victim told her that T.C. and the Defendant were fighting a lot and that if they separated, the victim wanted to live with the Defendant.

Four character witnesses, Rebecca Rose, Amy Howard, Jerry Maynard Franks, and Jeremy Simpson, each testified that he or she had known the Defendant for his entire life and that he was entitled to be believed under oath.

Following deliberation, the jury convicted the Defendant of one count of aggravated sexual battery as a lesser-included offense of rape of a child and two counts of rape of a child. The trial court sentenced the Defendant to 10 years' confinement for the aggravated sexual battery conviction in count one and 27 years' confinement for each rape of a child conviction in counts two and three, with all sentences to be served at 100% as a violent offender. The court ordered the Defendant to serve counts two and three concurrently with each other but consecutively to count one, for an effective sentence of 37 years' confinement.

On March 12, 2014, the Defendant timely filed a motion for judgment of acquittal or new trial. A hearing was held on March 25, 2014, after which the trial court denied the motion. The court entered an order setting out the same on April 28, 2014. The Defendant filed a timely notice of appeal to this court on April 21, 2014.

## ANALYSIS

On appeal, the Defendant raises two issues for our review: (1) whether he is entitled to a new trial based upon the State's failure to timely disclose certain exculpatory evidence, and (2) whether the evidence is sufficient to sustain his convictions. Upon our review, we affirm the judgments of the trial court.

**I**. **Late Disclosure of Evidence.** The Defendant first argues that he is entitled to a new trial based upon the State's failure to timely disclose text messages exchanged between the Defendant and T.C. He asserts that this evidence was potentially

exculpatory as some of the messages could have supported his position that T.C. coached him into falsely admitting his guilt and that the State's failure to timely disclose these messages prevented him from effectively using them at trial. The Defendant further argues that the State's failure to timely disclose the text messages violated Rule 16 of the Tennessee Rules of Criminal Procedure. The State responds that the Defendant failed to show a violation of Brady v. Maryland, 373 U.S. 83 (1963) or Tennessee Rule of Criminal Procedure 16, and thus, he is not entitled to relief. We agree with the State.

In regard to the late disclosure issue, during cross-examination of the Defendant, the Defendant testified that his wife, T.C., coached him through text messages into falsely admitting his guilt to protect the victim. In response to this testimony, the State confirmed that the Defendant had participated in text messages with his wife the weekend before he was investigated. The State then asked whether the Defendant recalled the following text message from his wife:

> Was I that bad of a wife that you did this? [The victim] has been scarred for life. There were things – you were her father. She looked up to you. Do you realize what you have done to our family? . . . There is no way [the victim] made these up.

Defense counsel then objected on the grounds that the text message was not included in the discovery materials. The State responded that the text message had been added to its discovery file at least a week before trial and under its open file policy, defense counsel could have obtained copies at any time. The State also offered to provide copies to defense counsel at that time. After a brief bench conference, the trial court allowed the State to continue questioning the Defendant about the text message. The Defendant did not recall his response to this text message and was unable to articulate the substance of any other text messages to support his theory that T.C. coached him.

To resolve this issue, our review of the record reveals only one text message, outlined above, which was read by the prosecution and agreed to by the Defendant during cross-examination. To the extent that the Defendant argues that the State violated Brady in failing to timely disclose this text, we disagree. As an initial matter, we fail to see how the above text is exculpatory. It does not aid the Defendant's case, challenge the credibility of a key witness, or call into question a key element of the prosecution's case. See Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001). Even if considered exculpatory, the Defendant agreed to participating in the text exchanges with his wife on his phone the weekend before the investigation. Clearly, the Defendant was aware of the information contained in the text before trial because (1) he discussed it at length during trial; and (2) it was transmitted to his phone. The State has no duty to disclose "information that the

accused already possesses or is able to obtain, or information which is not possessed by or under the control of the prosecution . . ." State v. Colvett, No. M2013-02488-CCA-R3-CD, 2014 WL 7223775, at \*22 (citing State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992)); Berry v. State, 366 S.W.3d 160, 179-80 (Tenn. Crim. App. 2011) ("There is no Brady violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose." (quoting Owens v. Guida, 549 F.3d 399, 415) (6th Cir. 2008)). Moreover, "when exculpatory evidence is equally available to the prosecution and the accused, the accused 'must bear the responsibility of [his] failure to seek its discovery.'" Marshall, 845 S.W.2d at 233 (citing and quoting United States v. McKenzie, 768 F.2d 602, 608 (5th Cir. 1985), cert. denied 474 U.S. 1086 (1986)). Because the Defendant failed to do so in this case, he is not entitled to relief.

We must acknowledge that the Defendant's case theory was that the victim's mother "coached" him into admitting his guilt, presumably via text message. In his brief to this court and during oral argument, the Defendant alluded to other text messages in the State's possession that were potentially exculpatory. He argued that the single text message listed above "undermine[d his] defense that [he] was lying to protect his daughter and that the wife had coached him on doing this." He further claimed that because he no longer had the cell phone that was used to transmit the texts and could not remember all the text communications, the State possessed information which "may have been of assistance" to his defense. It is indeed possible that more text messages were in the State's possession.[3] However, review of this issue is impossible because the Defendant did not include the text messages in the record on appeal. Without the text messages or a meaningful proffer, we are unable to determine the content of the text messages or whether they were favorable and material to the Defendant. Accordingly, the Defendant is not entitled to relief.

The Defendant also argues that notwithstanding any Brady violation, the State violated Tennessee Rule of Criminal Procedure 16(c) by failing to notify him of the addition of the text messages to its discovery file. Subsection (c) of Rule 16 imposes a continuing duty upon the State to "promptly disclose" the existence of additional evidence or material discovered before or during trial if, "(1) the evidence is subject to discovery or inspection under this rule, and (2) the other party previously requested, or the court ordered, its production."

---

[3] After reading the text message from the Defendant's wife into evidence, the State asked the Defendant whether that was his "idea of her coaching" him? The Defendant asked, "Are those the only ones," to which the State responded, "Oh, there's a lot more." In addition, after the bench conference concerning the text message, the State offered to provide defense counsel with copies of the text messages. It is unclear from the record whether the State did so.

Here, the Defendant has simply failed to establish that the State's failure to notify him of the text messages was so prejudicial that exclusion of the evidence was the only appropriate remedy. The State offered to provide copies of the text messages to defense counsel prior to continuing its cross-examination of the Defendant, and defense counsel failed to request a continuance to allow the Defendant to review the undisclosed evidence. A continuance would likely have been an appropriate remedy had it been requested, and by failing to seek a continuance, the Defendant risked waiver. See Tenn R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Exclusion of evidence, although necessary in some cases, is a "drastic remedy and should not be implemented unless there is no other reasonable alternative." State v. Gann, 251 S.W.3d 446, 457 (Tenn. Crim. App. 2007) (quoting State v. Smith, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995)). Further, as noted by the trial court, the Defendant was certainly aware of the existence of the text messages as he testified that T.C. coached him through text messages into admitting his guilt. Although he claims that he was "unduly prejudice[ed]" by the State's use of the messages, he has failed to establish what he would have done differently had the messages, otherwise admissible, been disclosed prior to trial. Rule 16(d) provides that a trial court may fashion an appropriate remedy as it "deems just under the circumstances." Tenn. R. Crim. P. 16(d)(2). In this case, we are unable to conclude that the trial court abused its discretion by denying the defendant's request that the questioning concerning the text messages be excluded.

**II. Sufficiency of the Evidence.** The Defendant next argues that the evidence is insufficient to sustain his convictions for aggravated sexual battery and rape of a child. The State responds that based upon the evidence presented, a rational juror could find the Defendant guilty beyond a reasonable doubt on all three counts. We agree with the State.

When considering the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant

bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

As relevant to this case, Tennessee Code Annotated section 39-13-504(a)(4) defines aggravated sexual battery, a Class B felony, as "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [where] [t]he victim is less than thirteen (13) years of age." Sexual contact means "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). Intimate parts "includes semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being." Id. § 39-13-501(2). Tennessee Code Annotated section 39-13-522(a) defines rape of a child, a Class A felony, as "the unlawful sexual penetration of the victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Sexual penetration means "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object in the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Id. § 39-13-501(7).

Viewed in the light most favorable to the State, the evidence in the case sub judice established that on three separate occasions, the Defendant sexually abused the victim.

At the time of all of the offenses, the victim was less than thirteen years of age. In the first instance, the Defendant called the victim to his bedroom and, after hugging and kissing her, pulled her onto the bed beside him. As the two lay side-to-side, the Defendant removed the victim's pants and panties and touched the outside and inside of her vagina with his finger. In the second incident, the Defendant again called the victim to his bedroom and pulled her onto the bed where he was lying naked under the covers. He removed the victim's pants and panties and put his penis into her vagina. In the third incident, the Defendant called the victim to the loveseat in the living room where he was watching television after the other family members had gone to bed. While sitting together in the loveseat, the Defendant removed the victim's pants and panties and his own pants and underwear. He placed his finger inside the victim's vagina and buttocks and then put his penis into her vagina.

In challenging the sufficiency of the evidence, the Defendant does not contest the evidence establishing the elements of any particular conviction. Instead, he attacks the credibility of the victim's testimony, noting that she did not reveal the abuse to her mother or any other adult for four years after the first incident and that there was no evidence that she contracted a sexually transmitted disease although he is a carrier of genital warts and genital herpes. This argument is without merit. As previously noted, credibility determinations and weight afforded to the evidence are matters reserved for the jury. This Court, on appeal, will not reweigh or reevaluate the evidence. Moreover, the testimony of a child victim, alone, is sufficient to uphold a conviction for child rape. State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003). Here, the victim testified in specific detail about each incident of abuse. Although not necessary to uphold a conviction, this testimony was corroborated by the physical evidence in the case. Dr. Piercey testified that the victim's injuries to her hymen were "definitive evidence of blunt force penetrating trauma" consistent with the victim's disclosure of abuse. She also explained that it is possible that the victim did not contract genital warts or genital herpes from her sexual encounters with the Defendant as the disease is not spread every time a carrier has sex. Additionally, the Defendant's statement to police, in which he admits to kissing the victim and touching her on her panties after taking Ambien, further corroborates the victim's account of the incidents. Viewed in the light most favorable to the State, we conclude that a rational juror could find the Defendant guilty on all three counts beyond a reasonable doubt.

## CONCLUSION

Based on the foregoing authority and analysis, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE